[No. S017206. Aug. 27, 1992.]

ERIK GALEN MENENDEZ et al., Petitioners, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
THE PEOPLE, Real Party in Interest.

436

**COUNSEL**

Leslie H. Abramson, Howard W. Gillingham, Lewis A. Wenzell, Gerald L. Chaleff, Jill D. Lansing, Gigi Gordon and Michael N. Burt for Petitioners.

Milgrim, Thomajan & Lee, Daniel H. Willick, Hogan & Hartson, Clifford D. Stromberg, Jeffrey G. Schneider, Brobeck, Phleger & Harrison, George A. Cumming, Jr., and Thomas M. Peterson as Amici Curiae on behalf of Petitioners.

No appearance for Respondent.

Ira Reiner, District Attorney, Harry B. Sondheim, Donald J. Kaplan and Brent Riggs, Deputy District Attorneys, for Real Party in Interest.

## OPINION

**MOSK, J.**—We granted review in this matter to consider a claim of the psychotherapist-patient privilege. For the reasons stated below, we conclude that the claim must be sustained in part and rejected in part.

### I

On August 20, 1989, Jose and Mary Louise Menendez were killed in their Beverly Hills residence. The incident was reported shortly after its occurrence by their sons Joseph Lyle (Lyle) and Erik Galen (Erik) Menendez (collectively sometimes the Menendezes or the brothers), who were then apparently 21 and 18 years of age, respectively.

On March 7, 1990, a magistrate in the Municipal Court of the Beverly Hills Judicial District of Los Angeles County issued a search warrant, pursuant to Penal Code section 1524, authorizing a search of the offices and residence of Leon Jerome Oziel, Ph.D., a clinical psychologist who was Lyle's and Erik's psychotherapist, and seizure of specified items if found therein, including audiotape recordings containing information relating to the killings. It seems that at or about the time of issuance, the magistrate appointed a special master pursuant to subdivision (c) of Penal Code section 1524 to accompany those who would serve the warrant.[1]

On March 8, 1990, accompanied by the special master, among others, officers of the Beverly Hills Police Department served the search warrant. The special master informed Dr. Oziel of the items sought. Dr. Oziel provided the materials. Claiming the psychotherapist-patient privilege on behalf of the Menendezes, he stated that none of the items should be

---

[1]Penal Code section 1524, subdivision (c), provides in pertinent part as follows.

". . . [N]o search warrant shall issue for any documentary evidence in the possession or under the control of any person, who is . . . a psychotherapist . . . [,] and who is not reasonably suspected of engaging or having engaged in criminal activity related to the documentary evidence for which a warrant is requested unless the following procedure has been complied with:

"(1) At the time of the issuance of the warrant the court shall appoint a special master . . . to accompany the person who will serve the warrant. Upon service of the warrant, the special master shall inform the party served of the specific items being sought and that the party shall have the opportunity to provide the items requested. If the party, in the judgment of the special master, fails to provide the items requested, the special master shall conduct a search for the items in the areas indicated in the search warrant.

"(2) If the party who has been served states that an item or items should not be disclosed, they shall be sealed by the special master and taken to court for a hearing.

"At the hearing the party searched shall be entitled to raise . . . a claim that the item or items are privileged, as provided by law. Any such hearing shall be held in the superior court. . . ."

disclosed because all were within the scope of the protection. The special master sealed the materials for a subsequent hearing in the superior court. Among the items in question were three audiotape cassettes (and certain copies thereof): one contains Dr. Oziel's notes relating to sessions with Lyle and Erik on October 31 and November 2, 1989; one contains Dr. Oziel's notes relating to a session with Erik on November 28, 1989; and one contains an actual session Dr. Oziel conducted with Lyle and Erik on December 11, 1989.[2] Lyle and Erik were subsequently arrested and placed in custody.

On March 12, 1990, a felony complaint was filed on behalf of the People against the Menendezes in the Municipal Court of the Beverly Hills Judicial District of Los Angeles County.

Count I charged the brothers with the murder of their father. (Pen. Code, § 187.) As to this offense, it alleged, inter alia, the special circumstances of intentional murder for financial gain (id., § 190.2, subd. (a)(1)) and intentional murder while lying in wait (id., § 190.2, subd. (a)(15)).

Count II charged the brothers with the murder of their mother. As to this offense, it alleged, inter alia, the special circumstances of intentional murder for financial gain and intentional murder while lying in wait.

The complaint separately alleged the special circumstance of multiple murder. (Pen. Code, § 190.2, subd. (a)(3).)

II

On March 19, 1990, Dr. Oziel filed a motion in the Los Angeles Superior Court under Penal Code section 1524, subdivision (c), effectively claiming for the Menendezes the psychotherapist-patient privilege, as established by Evidence Code section 1014,[3] as to the items seized pursuant to the search warrant.

---

[2]Hereafter, we shall use "the three audiotape cassettes" and similar phrases to refer to both the originals and the copies.

[3]Evidence Code section 1014 provides: ". . . [T]he patient, whether or not a party, has a privilege to refuse to disclose, and to prevent another from disclosing, a confidential communication between patient and psychotherapist . . . ."

Evidence Code section 1012 defines "confidential communication between patient and psychotherapist" as "information, including information obtained by an examination of the patient, transmitted between a patient and his psychotherapist in the course of that relationship and in confidence by a means which, so far as the patient is aware, discloses the information to no third persons other than those who are present to further the interest of the patient in the consultation, or those to whom disclosure is reasonably necessary for the transmission of the information or the accomplishment of the purpose for which the psycho-

The Menendezes successfully moved to intervene. They filed papers in support of the privilege.

By contrast, the People, through the Los Angeles District Attorney, filed papers in opposition. They argued, inter alia, that the privilege was not available on its own terms. They also argued that certain exceptions operated. Most prominent was the exception for a "dangerous patient," as stated in Evidence Code section 1024.[4] Also cited was the exception for a "crime or tort" under Evidence Code section 1018.[5] Both sides addressed the question in light of our then recently decided case of *People* v. *Clark* (1990) 50 Cal.3d 583 [268 Cal.Rptr. 399, 789 P.2d 127].

Over several days between June 8 and August 3, 1990, the superior court conducted an evidentiary hearing on the claim of the psychotherapist-patient privilege as to the items seized.

At the inception, the People offered affidavits by certain persons, including Judalon Smyth, who had been Dr. Oziel's lover. The superior court received some of the documents in evidence, at least in part; it accepted others as offers of proof; it placed Smyth's affidavit into the latter group and not the former.[6]

therapist is consulted, and includes a diagnosis made and the advice given by the psychotherapist in the course of that relationship."

[4]Evidence Code section 1024 provides: "There is no privilege . . . if the psychotherapist has reasonable cause to believe that the patient is in such mental or emotional condition as to be dangerous to himself or to the person or property of another and that disclosure of the communication is necessary to prevent the threatened danger."

[5]Evidence Code section 1018 provides: "There is no privilege . . . if the services of the psychotherapist were sought or obtained to enable or aid anyone to commit or plan to commit a crime or a tort or to escape detection or apprehension after the commission of a crime or a tort."

[6]The People sought to introduce Smyth's affidavit. The Menendezes objected. The superior court observed that "[i]t is fairly clear a lot of what is said in here in the Smyth affidavit is in fact hearsay . . . ." After expending considerable time in line-by-line review to determine admissibility, the court called a halt. It stated: "I have to tell you I am not familiar with the law concerning affidavits and hearing by affidavits." Counsel for Erik suggested: "I think our time would be better spent if we recess, carefully research the law of affidavits, because that's all we are trying to do. Otherwise [the People] can put Jud[a]lon Smyth on." The People's representative declared: "No objection." The court accepted the suggestion and soon ordered a recess. It did not further consider the question of the admissibility of Smyth's affidavit.

About six weeks later, the superior court gave one of the People's representatives an opportunity "to indicate the witnesses you had available and could have called." The representative stated in part relevant here: "Jud[a]lon Smyth would testify as to those items contained in her affidavit." Counsel for Lyle interjected: "Excuse me, Your Honor, just so the record is clear, what is [the People's representative] doing? This is not testimony that's going to be accepted by the court in ruling on its decision without allowing counsel for both sides to have a chance to examine and cross-examine? Is this just an offer of proof and if you need

For the most part, on the Menendezes' motion pursuant to Evidence Code section 915[7] and over the People's opposition, the superior court held the proceedings in camera in the presence of the brothers and their respective counsel without the People's representatives. At the hearing in camera, Dr. Oziel and Smyth were among those who testified. Exhibits submitted included the three audiotape cassettes as well as transcripts of their contents made at the direction of the Menendezes' counsel. The People filed a list of questions that they requested the court to ask Dr. Oziel. They also filed a request for a statement of decision, including resolution of certain specified issues.

On August 6, 1990, the superior court rejected the claim of the psychotherapist-patient privilege as to each and every one of the three audiotape cassettes.[8] In a statement of decision, it set out its findings of fact and conclusions of law. As pertinent here, those determinations are to the following effect.

With regard to each of the sessions—October 31, November 2, November 28, and December 11—the requirements for the psychotherapist-patient privilege were satisfied. Specifically, there were "confidential communication[s] between patient and psychotherapist . . . ." (Evid. Code, § 1014.)

---

this it's available?" (Paragraphing omitted.) The People's representative responded: "That's exactly it." Shortly thereafter, in camera, the court informed counsel for the Menendezes that if it intended to rely on Smyth's affidavit, it would so notify them and give them an opportunity to object.

Later, Smyth herself testified.

There is no indication that the superior court did in fact rely on Smyth's affidavit. Certainly, it did not notify counsel of any intent to do so or give them an opportunity to object. We recognize that during the proceedings at which the People sought to introduce the affidavit, the clerk affixed an "admitted in evidence" label thereto. Plainly, she did so in error.

[7]Evidence Code section 915 provides as follows:

· "(a) Subject to subdivision (b), the presiding officer may not require disclosure of information claimed to be privileged . . . in order to rule on the claim of privilege; provided, however, that in any hearing conducted pursuant to subdivision (c) of Section 1524 of the Penal Code in which a claim of privilege is made and the court determines that there is no other feasible means to rule on the validity of such claim other than to require disclosure, the court shall proceed in accordance with subdivision (b).

"(b) When a court is ruling on a claim of privilege [including, inter alia, that for psychotherapist and patient] and is unable to do so without requiring disclosure of the information claimed to be privileged, the court may require the person from whom disclosure is sought or the person authorized to claim the privilege, or both, to disclose the information in chambers out of the presence and hearing of all persons except the person authorized to claim the privilege and such other persons as the person authorized to claim the privilege is willing to have present. If the judge determines that the information is privileged, neither he nor any other person may ever disclose, without the consent of a person authorized to permit disclosure, what was disclosed in the course of the proceedings in chambers."

[8]The ruling covered the three audiotape cassettes only. It did not even purport to touch the transcripts of their contents made at the direction of the Menendezes' counsel. Those transcripts, of course, had not been seized.

Dr. Oziel was a psychotherapist and Lyle and Erik were his patients. Further, the "information" that passed among them was "transmitted . . . in the course of [the psychotherapeutic] relationship and in confidence by a means which, so far as [Lyle and Erik] [were] aware, disclose[d] the information to no third persons" outside the scope of the protection. (*Id.*, § 1012.)[9] Indeed, it was expressly found that "all of the sessions . . . were intended by the parties thereto to be for the purpose of therapy."[10] It was impliedly found that the "crime or tort" exception was unavailable.

Next, neither Lyle nor Erik waived the privilege as to any of the communications made at any of the sessions. It was expressly found that there was no "intentional waiver"; it was impliedly found that there was no waiver by operation of law.[11]

As to the sessions of October 31 and November 2, however, the conditions of the "dangerous patient" exception were met. First, Dr. Oziel had reasonable cause to believe that Lyle and Erik were dangerous: they made threats of harm that were aimed at him alone but also collaterally endangered his wife, Laurel Oziel, and his lover, Judalon Smyth, because of their relationships. Second, he had reasonable cause to believe that disclosure of all the communications made at these sessions and reflected on audiotape was necessary to prevent any harm. Soon, he disclosed all these communications to the two women in separate warnings.

By contrast, as to the sessions of November 28 and December 11, one of the conditions of the "dangerous patient" exception was *not* met. Specifically, it was found that the evidence was insufficient to establish that Dr. Oziel had reasonable cause to believe that disclosure of any of the communications made at either of these sessions and reflected on audiotape was necessary to prevent any harm.

All the same, under *Clark*—which the superior court read to hold that the privilege requires the communication to be and remain "confidential"—the privilege could no longer be claimed because the communications were no longer "confidential."

---

[9]There is an express finding that Judalon Smyth overheard some of the communications at the October 31 session as an eavesdropper. But there is also an implied conclusion that the interception did not negate the privilege.

[10]There is a finding as to motive in contrast to purpose: Dr. Oziel "continu[ed] to see the brothers"—evidently after the October 31 session—"partly because he still feared them and felt that the threat from them diminished when he could treat them and determine the current degree of threat they presented."

[11]The "no waiver" finding was made in the face of a separate finding that at (apparently) the October 31 and November 2 sessions, Lyle "continued to make threats after being . . . advised" by Dr. Oziel that "if threats were made in the course of a session then there was 'no confidentiality.' "

The communications at the October 31 and November 2 sessions lost their "confidential" status when they were disclosed by Dr. Oziel not long afterwards to Laurel Oziel and Judalon Smyth in separate warnings. He had engaged each woman as an agent in his professional practice, although not to provide psychotherapy. But he made the disclosures to each outside the privilege—that is to say, not as his agent in his practice, but simply as a possible victim of the Menendezes.

Next, the communications at the November 28 and December 11 sessions lost their "confidential" status in part because they "were simply restatements . . . and amplifications of" similar communications at the October 31 and November 2 sessions; in part because they had been rendered "nonconfidential," as it were, "before the fact" by the disclosure of similar communications from those earlier sessions; and in part because each and all of the communications at each and all of the sessions constituted but one "communication."

In addition, it was effectively found that the communications at all the sessions in their entirety lost their "confidential" status when they were somehow obtained by Judalon Smyth and thereafter disseminated by her outside the privilege to various persons.[12]

· Finally, neither Lyle nor Erik did any harm to Dr. Oziel, Laurel Oziel, or Judalon Smyth.

### III

On August 14, 1990, the Menendezes filed a petition for writ of mandate and/or prohibition in the Court of Appeal, Second Appellate District, attacking the superior court's ruling rejecting the claim of the psychotherapist-patient privilege as to the three audiotape cassettes. In support, they also filed certain transcripts and exhibits under seal against the eyes of the People. On August 23, the Court of Appeal, Second Appellate District, Division Five, summarily denied the petition with a citation to *Clark.*

On August 29, 1990, the Menendezes filed a petition for review of the Court of Appeal's decision. On October 10, we granted review and transferred the matter to the Court of Appeal, Second Appellate District, Division

---

[12]There is a suggestion that the communications at all the sessions in their entirety lost their "confidential" status when they were "disclosed" to audiotape through Dr. Oziel's act of making recordings and copies of recordings—a step he took in order to prevent any harm from the Menendezes. It was found that he told the brothers the audiotape recordings would be revealed if "something 'happened' to [him], i.e., he was killed or disappeared mysteriously."

There is also a suggestion that the communications at all the sessions in their entirety lost their "confidential" status "before the fact" when Erik disclosed certain information to a friend named Craig Cignarelli shortly after the killings.

Five, with directions to vacate its summary denial and cause an alternative writ to issue.

On March 28, 1991, the Court of Appeal filed a decision again denying the Menendezes' petition. It noted that the sole issue in the proceeding was the validity of the claim of the psychotherapist-patient privilege as to the three audiotape cassettes. In stating the facts, it did not cleave to the superior court's findings but drew largely from Judalon Smyth's affidavit. Its reasoning was as follows.

The psychotherapist-patient privilege did not apply to any of the three audiotape cassettes. As to the October 31 and November 2 sessions, the "dangerous patient" exception operated. Here, the Court of Appeal agreed with the superior court's findings and conclusions. As to the November 28 and December 11 sessions, the privilege was not available in the first instance. "[T]he communications were not made in the course of a psychotherapist-patient relationship." "[C]ontrary to what the [superior] court found, these sessions were not 'for the purpose of therapy.' Dr. Oziel's main objective was to insure his own safety in the face of [the Menendezes'] threats. To [the Menendezes], Dr. Oziel's primary role was not that of a therapist who could provide treatment for their emotional problems, but an individual who, if he could be trusted, could portray them from a sympathetic viewpoint if they were arrested and tried for the murders." In a word, "Dr. Oziel was motivated by self-preservation, and [the Menendezes] were motivated by self-interest. The purported 'therapy' was, in fact, a charade."

On April 29, 1991, we handed down our decision in *People* v. *Wharton* (1991) 53 Cal.3d 522 [280 Cal.Rptr. 631, 809 P.2d 290], which explicated the "dangerous patient" exception.

On May 6, 1991, the Menendezes filed a petition for review of the Court of Appeal's decision. On June 27, we granted review.[13]

IV

The sole issue here is the validity of the claim of the psychotherapist-patient privilege as to the three audiotape cassettes seized from Dr. Oziel pursuant to the search warrant.[14]

As stated, one of the audiotape cassettes contains Dr. Oziel's notes relating to sessions with Lyle and Erik on October 31 and November 2,

---

[13]On August 28, 1991, the People filed a "Motion to Unseal Record on Appeal," which covered the transcripts and exhibits submitted by the Menendezes in support of their petition for writ of mandate and/or prohibition. On September 19, we denied the request.

[14]Among the many issues that we do *not* today consider, less still resolve, are the following: under what conditions a search and seizure aimed at a psychotherapist is lawful; whether the

1989; one contains Dr. Oziel's notes relating to a session with Erik on November 28, 1989; and one contains an actual session Dr. Oziel conducted with Lyle and Erik on December 11, 1989.

Present throughout the discussion of the psychotherapist-patient privilege in the superior court is its reading of *Clark*. For it was in light of its interpretation of our decision that the question was litigated and decided.

By contrast, absent from the treatment of the "dangerous patient" exception in both the superior court and the Court of Appeal is *Wharton*. That is understandable. *Wharton* was handed down after the proceedings below were brought to a close.

After review, we believe that the reasoning of the lower courts is unsound to the extent it is based on the superior court's reading of *Clark* and not on *Wharton*.

Considered within its context, *Clark* holds only that when a psychotherapist discloses a patient's threat to the patient's intended victim in a so-called "*Tarasoff* warning" (*Tarasoff* v. *Regents of University of California* (1976) 17 Cal.3d 425 [131 Cal.Rptr. 14, 551 P.2d 334, 83 A.L.R.3d 1166]), the disclosed threat is not covered by the privilege. (*People* v. *Clark, supra,* 50 Cal.3d at pp. 618-620.)

■ As noted, however, the superior court read *Clark* to hold broadly that the privilege requires the communication to be and remain "confidential." The law is otherwise.

The privilege can cover a communication that was never, in fact, "confidential"—so long as it was made in confidence. The communication need only comprise "information . . . transmitted between a patient and his psychotherapist in the course of that relationship and in confidence by a means which, *so far as the patient is aware,* discloses the information" to no "outside" third person. (Evid. Code, § 1012, italics added.)

· Similarly, the privilege can cover a communication that has lost its "confidential" status.

---

search and seizure in this case was valid, except insofar as the psychotherapist-patient privilege is concerned; whether the psychotherapist-patient privilege applies to any material or information other than the three audiotape cassettes; and whether any nonprivileged material or information is admissible in any proceeding for any purpose.

The People, who are real party in interest, have requested us to take judicial notice of the records of the superior court in this proceeding. We may, of course, "take judicial notice of" (Evid. Code, § 459, subd. (a)) the "[r]ecords of . . . any court of this state" (*id.,* § 452, subd. (d)). We do so.

"[T]he patient . . . has a privilege to refuse to disclose, *and to prevent another from disclosing,* a confidential communication between patient and psychotherapist . . . ." (Evid. Code, § 1014, italics added.)

The "privilege to prevent" can bar testimony by *anyone.* (Recommendation Proposing an Evidence Code (Jan. 1965) 7 Cal. Law Revision Com. Rep. (1965) pp. 174, 188, 195.)

Included are persons within the scope of the protection, such as the psychotherapist himself. (See Tent. Recommendation and Study Relating to the Uniform Rules of Evidence, art. V, Privilege (Feb. 1964) 6 Cal. Law Revision Com. Rep. (1964) p. 240 [dealing with what would become the "privilege to prevent" under Evid. Code, § 1014].)

Also included are "outside" third persons. (See Recommendation Proposing an Evidence Code, *supra,* 7 Cal. Law Revision Com. Rep. at pp. 174, 188, 195.) In this aspect, the "privilege to prevent" effectively repudiates the old "eavesdropper rule," under which the privilege is defeated whenever any "outside" "third person—eavesdropper, finder or interceptor—overhears or otherwise receives the confidential communication . . . ." (2 Witkin, Cal. Evidence (3d ed. 1986) Witnesses, § 1074, p. 1019; see Recommendation Proposing an Evidence Code, *supra,* 7 Cal. Law Revision Com. Rep. at pp. 174, 188, 195.)

The superior court's reading of *Clark* implies that the privilege is not intended to enable the patient to prevent disclosure in legal proceedings. To be sure, the purpose is not to grant him power to bar evidence *for its own sake.* But the purpose is indeed to grant him power to bar evidence—in order to protect his right to privacy and promote the psychotherapeutic relationship.

Moreover, the superior court's reading of *Clark* suggests that the patient's privacy is breached and the psychotherapeutic relationship destroyed as soon as any communication loses its "confidential" status in any degree. Such a proposition is unsupported. For example, if the communication is insignificant in content or the disclosure is narrow in scope, the patient's privacy may be implicated only slightly. Also, and perhaps more important, the psychotherapeutic relationship may survive even the broadest disclosure of the most substantial communication—much as other relationships do. That seems especially true when, as here, the patient whose communication is disclosed is unaware of the fact.

Further, the superior court's reading of *Clark* appears inconsistent with *Clark* itself. In *Roberts* v. *Superior Court* (1973) 9 Cal.3d 330, 341 [107

Cal.Rptr. 309, 508 P.2d 309], we held that only the patient has the power to waive the privilege in any part. A fortiori, only the patient has the power to cause the privilege to go out of existence in its entirety. By its citation to *Roberts*, *Clark* impliedly accepts the patient's control of waiver of the privilege. But inexplicably, the superior court interprets *Clark* to all but expressly reject the patient's control of the privilege's very existence.

It is clear that considered within its context, *Clark* is inapplicable here: Dr. Oziel did not disclose any threat by Lyle and/or Erik to any intended victim in a *Tarasoff* warning because neither Lyle nor Erik threatened anyone other than Dr. Oziel himself.

Nevertheless, the superior court did in fact apply *Clark*—or rather, its plainly overbroad and erroneous reading of *Clark*—and did so with unfortunate effect.

█ *Wharton* is different. Its applicability cannot be doubted. It bears directly on the crucial issue of the "dangerous patient" exception. As pertinent here, *Wharton* holds in substance that a psychotherapist's *Tarasoff* warning to the patient's intended victim is not covered by the privilege even if it relates an otherwise protected communication, provided that the conditions of the exception are satisfied, viz., there is reasonable cause for the psychotherapist to believe that (1) the patient is dangerous *and* (2) disclosure of the communication is necessary to prevent any harm. (See *People* v. *Wharton, supra,* 53 Cal.3d at pp. 548-563.) The reasoning that underlies the *Wharton* holding extends to the circumstances that present themselves here. Accordingly, a psychotherapist's warning to a possible victim of the patient is not privileged, so long as the requirements of the exception are met.

With the foregoing in mind, we now proceed with our analysis.

A

█ We first consider the portion of the audiotape containing Dr. Oziel's notes of his October 31 session with Lyle and Erik.

At the outset, the psychotherapist-patient privilege was available. The notes reflect "confidential communication[s] between patient[s]," i.e., Lyle and Erik, "and psychotherapist," i.e., Dr. Oziel. (Evid. Code, § 1014.) The "information" that passed among them was "transmitted . . . in the course of [the psychotherapeutic] relationship and in confidence by a means which, so far as [Lyle and Erik] [were] aware, disclose[d] the information" to no "outside" third person. (*Id.,* § 1012.)

■ The availability of the privilege is compelled under the facts found by the superior court. Such findings are reviewed for substantial evidence. (E.g., *People* v. *Louis* (1986) 42 Cal.3d 969, 984-985 [232 Cal.Rptr. 110, 728 P.2d 180]; *People* v. *Leyba* (1981) 29 Cal.3d 591, 596-597 [174 Cal.Rptr. 867, 629 P.2d 961].) ■ The findings here are more than adequately supported. Dr. Oziel gave testimony that provided a sufficient basis in and of itself. Further, Judalon Smyth gave testimony that furnished corroboration. True, the superior court recognized—altogether soundly, in our view—that Dr. Oziel and Smyth were witnesses whose testimony could be credited only after careful scrutiny of both their words and demeanor. To quote the court's charitable description, each had "multiple motives, multiple motivations, multiple agendas." But it nevertheless believed them in part relevant here. We see no reason to disagree.[15]

We acknowledge that the superior court found that the communications at this session lost their "confidential" status when they were disclosed by Dr. Oziel not long afterwards to Laurel Oziel and Judalon Smyth in separate warnings outside the privilege—that is to say, when they were disclosed by him to each woman not as his agent in his practice, but simply as a possible victim of the Menendezes.

We also acknowledge that the superior court effectively found that the communications at all the sessions in their entirety lost their "confidential" status when they were somehow obtained by Judalon Smyth and thereafter disseminated by her outside the privilege.

■ ■ ■ These facts, however, are of consequence only under the superior court's reading of *Clark*—a reading we reject as overbroad and erroneous.[16]

■ The "dangerous patient" exception, however, was indeed applicable. Its conditions were met: Dr. Oziel had reasonable cause to believe that Lyle and Erik were dangerous to himself directly and to Laurel Oziel and Judalon Smyth collaterally, and that disclosure to the two women was necessary to prevent any harm.

[15]The superior court's finding that Judalon Smyth overheard some of the communications at the October 31 session as an eavesdropper does not negate the privilege. As noted, the superior court itself impliedly so concluded. The privilege, we have stated above, can cover a communication that was never, in fact, confidential.

[16]The superior court's suggestion that the communications at this and the following sessions lost their "confidential" status solely through Dr. Oziel's act of audiotape-recording is unsound. For present purposes, Dr. Oziel's act simply cannot be characterized as a disclosure. Perhaps it could be deemed a *potential* disclosure *conditioned* on untoward conduct by the Menendezes—conduct, it turned out, that never arose. But that is all.

■ The superior court made findings—which are amply supported—that establish the exception. It impliedly recognized that the "reasonableness" of the requisite "reasonable cause to believe" must be determined in light of the standards of the psychotherapeutic community. The test is objective, but takes account of all the relevant circumstances; it is based on the norms prevailing among psychotherapists as a group, but allows broad discretion to the individual psychotherapist. In certain cases, expert testimony as to the relevant standards may be necessary. ■ Here, it was not: the evidence all but compelled the conclusion of "reasonableness." In any event, expert testimony bearing on the standards was, in fact, presented by Dr. Oziel himself.

The Menendezes do not seriously argue against the applicability of the exception. Rather, they maintain that we should remand the matter to the superior court to make findings of fact under *Wharton.*

On the present record, such a remand is unnecessary. The superior court found—with more than sufficient support in the record—that Dr. Oziel disclosed to Laurel Oziel and Judalon Smyth, in separate warnings against any collateral harm, all the communications made at this session and reflected on audiotape, having reasonable cause to believe that the Menendezes were dangerous and that disclosure of these communications was necessary.

On this basis, we may properly sustain, as an anticipation of *Wharton*, the superior court's ruling of no privilege as to the portion of the audiotape containing Dr. Oziel's notes of this session.

We emphasize that the "dangerous patient" exception requires *only* reasonable cause for belief by the psychotherapist in the dangerousness of the patient and the necessity of disclosure. Certainly, it does not demand that the patient must be dangerous to a person *other than* the psychotherapist— although here the patients were. Nor does it demand that the psychotherapist must actually disclose the relevant communication or even issue a warning. Indeed, in *Wharton* we made plain that the exception was "not keyed to . . . disclosure" or warning, but to the "existence of the specified factual predicate," viz., reasonable cause for belief in the dangerousness of the patient and the necessity of disclosure. (53 Cal.3d at pp. 560-561; see *People* v. *Gomez* (1982) 134 Cal.App.3d 874, 881 [185 Cal.Rptr. 155] [to similar effect]; *Mavroudis* v. *Superior Court* (1980) 102 Cal.App.3d 594, 604 [162 Cal.Rptr. 724] [same]; *Lemelle* v. *Superior Court* (1978) 77 Cal.App.3d 148, 159 [143 Cal.Rptr. 450] [same].)

If ever there was any question about the matter, it was answered, implicitly but clearly, in *Tarasoff* v. *Regents of University of California, supra,* 17

Cal.3d 425. There, we dealt generally with the psychotherapist's duty under the common law "to use reasonable care to protect the intended victim" of a patient who "presents a serious danger of violence." (*Id.* at p. 431.) Plainly, the policies of the common law are similar to those of the "dangerous patient" exception.

In *Tarasoff,* we held that "[w]hen a therapist determines, or pursuant to the standards of his profession should determine, that his patient presents a serious danger of violence to another, he incurs an obligation to use reasonable care to protect the intended victim against such danger. The discharge of this duty may require the therapist to take one or more of various steps, depending upon the nature of the case. Thus it may call for him to warn the intended victim or others likely to apprise the victim of the danger, to notify the police, or to take whatever other steps are reasonably necessary under the circumstances." (17 Cal.3d at p. 431.) On that basis, we concluded that the plaintiffs therein could state a cause of action in negligence against the defendant psychotherapists for their alleged failure to give a warning to their patient's intended, and actual, victim or to others.

In the course of our discussion in *Tarasoff,* we implied that the "dangerous patient" exception would be applicable to the psychotherapist-patient communications as pleaded. We noted that Evidence Code section 1024—which "established that psychotherapeutic communication is not privileged when disclosure is necessary to prevent threatened danger" (17 Cal.3d at p. 440, fn. 12)—was a " 'clear expression of legislative policy concerning the balance between the confidentiality values of the patient and the safety values of his foreseeable victims[ ]' " (*id.* at p. 441, fn. 13). Accordingly, we concluded that "the public policy favoring protection of the confidential character of patient-psychotherapist communications must yield to the extent to which disclosure is essential to avert danger to others. The protective privilege ends where the public peril begins." (*Id.* at p. 442.)

To the extent that the Menendezes argue that the "dangerous patient" exception requires *something more than* reasonable cause for belief by the psychotherapist in the dangerousness of the patient and the necessity of disclosure, they are unpersuasive.

B

We next consider the portion of the audiotape containing Dr. Oziel's notes of his November 2 session with Lyle and Erik.

Here too, the psychotherapist-patient privilege was available at the outset. The notes reflect confidential communications between Dr. Oziel as a psychotherapist and Lyle and Erik as his patients. The superior court made

findings that compel this conclusion. These findings are supported by substantial evidence, including again the credited testimony of Dr. Oziel and Judalon Smyth.

Again, we acknowledge that the superior court found that the communications at this session lost their "confidential" status when they were disclosed by Dr. Oziel not long afterwards to Laurel Oziel and Judalon Smyth in separate warnings outside the privilege and that it effectively found that the communications at all the sessions in their entirety lost their "confidential" status when they were somehow obtained by Smyth and thereafter disseminated by her outside the privilege. With the superior court's overbroad and erroneous reading of *Clark* now rejected, however, these facts are of no consequence.

Here too, however, the "dangerous patient" exception was applicable. Dr. Oziel had reasonable cause to believe that Lyle and Erik were dangerous to himself directly and to Laurel Oziel and Judalon Smyth collaterally, and that disclosure was necessary to prevent any harm. The superior court made amply supported findings to that effect. On the present record, a remand for findings under *Wharton* is unnecessary. The court found, with more than sufficient support, that Dr. Oziel disclosed to the two women, in separate warnings against any collateral harm, all the communications made at this session and reflected on audiotape, having reasonable cause for belief in the dangerousness of the Menendezes and the necessity of disclosure. On this basis, we may properly sustain, as an anticipation of *Wharton*, the superior court's ruling of no privilege as to the portion of the audiotape here reviewed.

## C

We then consider the portion of the audiotape containing Dr. Oziel's notes of his November 28 session with Erik.

Yet again, the psychotherapist-patient privilege was available at the outset. The notes reflect confidential communications between Dr. Oziel as a psychotherapist and Erik as his patient. The superior court made findings that compel this conclusion. These findings are supported by substantial evidence, including again the credited testimony of Dr. Oziel and Judalon Smyth.

The Court of Appeal concluded differently. As noted, it determined that "contrary to what the [superior] court found," neither this session nor that of December 11 was " 'for the purpose of therapy.' " In this determination, it erred.

The Court of Appeal's implicit factual basis was Judalon Smyth's affidavit, which it concluded had been received in evidence. That conclusion, however, was erroneous. (See fn. 6, *ante*.) As stated, Smyth was a witness whose testimony could be credited only after careful scrutiny of both her words and demeanor. An affidavit by such a person—especially one, as here, that is replete with hearsay—is too weak an instrument to strike down the superior court's finding.

The Court of Appeal's express legal basis was its belief that "Dr. Oziel was motivated by self-preservation, and [the Menendezes] were motivated by self-interest. The purported 'therapy' was, in fact, a charade."

In substantial part, the Court of Appeal's view implicates the "crime or tort" exception. The superior court, however, impliedly found this exception unavailable. This finding is amply supported.

In any event, motive is largely, if not totally, immaterial. It appears that in virtually all psychotherapy, what motivates the participants is *not* psychotherapy for its own sake. For example, the psychotherapist is sometimes motivated by self-interest, as when he earns his living solely through his practice. For his part, the patient is sometimes motivated by self-preservation, as when he struggles to resist the temptation of suicide or antisocial conduct. As a general matter, the dispositive fact is *what* the participants do, not *why*. (But see Evid. Code, § 1018.) To the extent that the Court of Appeal stated or implied that psychotherapy *cannot* take place under conditions of threat, its position is without adequate legal or factual basis.

Moreover, the superior court all but expressly asked—and answered in the negative—the question whether this session and that of December 11 were "charades." As noted, it expressly found that all the sessions were indeed "for the purpose of therapy." This finding is amply supported.

The superior court proceeded to determine that the privilege, although initially available, did not remain so and hence may no longer be claimed.

In general, the superior court followed its now-rejected reading of *Clark*. It thereby misstepped, and misstepped fatally.

In part, the superior court reasoned that the communications at this session as well as those at that of December 11 "were simply restatements . . . and amplifications of" similar communications at the October 31 and November 2 sessions. For purposes of discussion, we shall accept the court's characterization. It is manifest, however, that the privilege covers *all* communications within its ambit. There is no basis to limit its scope to the first communication dealing with a given subject.

In other part, the superior court reasoned that the communications at this session as well as those at that of December 11 had been rendered "nonconfidential" "before the fact" by the disclosure of similar communications from the October 31 and November 2 sessions. But to our mind, what is spoken at one time cannot reasonably be deemed to reveal what is not yet spoken.[17]

In still other part, the superior court reasoned that each and all of the communications at each and all of the sessions constituted but one "communication." A single "communication" may indeed encompass a substantial amount of information. But unless the term is stretched beyond reason, it simply cannot embrace all that passed between Dr. Oziel and the Menendezes in four sessions over a period of almost six weeks.

We now turn to the "dangerous patient" exception. As stated, this exception depends on the satisfaction of two conditions, viz., the psychotherapist must have reasonable cause to believe that (1) the patient is dangerous *and* (2) disclosure is necessary to prevent any harm. As to this session as well as that of December 11, the superior court found that the second requirement was not met: the evidence was insufficient to establish that Dr. Oziel had reasonable cause to believe that disclosure was necessary. This finding is amply supported.

Finally, there was no waiver. The superior court expressly found that there was no "intentional waiver" as to the communications made at this session or any other. It impliedly found that there was no waiver by operation of law. These findings, separately and together, are sound.

## D

We last consider the portion of the audiotape containing the recording of Dr. Oziel's December 11 session with Lyle and Erik.

Here too, the psychotherapist-patient privilege was available at the outset. The recording comprises confidential communications between Dr. Oziel as a psychotherapist and Lyle and Erik as his patients. The superior court made findings that compel this conclusion. These findings are supported by substantial evidence, including again the credited testimony of Dr. Oziel and Judalon Smyth.

The Court of Appeal concluded differently. As noted above, it determined that "contrary to what the [superior] court found," this session was "not

---

[17]Accordingly, we must hold unsound the superior court's suggestion that the communications at all the sessions in their entirety lost their "confidential" status "before the fact" when Erik disclosed certain information to his friend Craig Cignarelli shortly after the killings.

'for the purpose of therapy.' " But as we have explained, it erred in this determination.

For its part, the superior court concluded that the privilege, although initially available, did not remain available and hence may no longer be claimed. But as also explained, it too erred.

Further, the "dangerous patient" exception does not operate. Recall that the disclosure-is-necessary requirement was not met as to this session.

Finally, as we have stated, there was no waiver.[18]

---

[18]It appears that in light of its findings, the superior court might have been able to conclude that as to some communications, Lyle waived the privilege by operation of law—albeit contrary to his actual intent—when he "continued to make threats after being . . . advised" by Dr. Oziel that "if threats were made in the course of a session then there was 'no confidentiality.' " The court, however, made no such conclusion. We decline to set out on a path that it chose not to take.

The People raise several claims. Some—including points that have been resolved or rendered immaterial in the course of the analysis—need not be addressed. Others, however, require consideration. They are discussed below.

The People claim that the psychotherapist-patient privilege was unavailable from the time of the seizure of the three audiotape cassettes. In support, they allege as follows: in spite of his assertion of the privilege, Dr. Oziel invited the members of the warrant party to listen to the audiotapes; and he did so in order to substantiate a claim that he had been threatened by the Menendezes, who were then at large, and was in need of protection. The point fails. Dr. Oziel's "invitation" appears immaterial. In any event, it is outside the proper scope of the legal questions and factual matters at issue in this proceeding.

The People then claim that the superior court erred under the Evidence Code by conducting the evidentiary hearing largely in camera. As noted, Evidence Code section 915 requires such a procedure "in any hearing conducted pursuant to subdivision (c) of Section 1524 of the Penal Code in which a claim of privilege is made"—such as here—when "the court determines that there is no other feasible means to rule on the validity of such claim other than to require disclosure . . . ." (Evid. Code, § 915, subd. (a).) The court impliedly made such a determination. A decision of this sort is evidently reviewed for abuse of discretion. No abuse appears. Indeed, the course that the court took was the only one reasonably available.

Next, the People claim that the superior court erred under the Evidence Code by failing to exclude the Menendezes and their respective counsel from the hearing in camera. The court could not have ordered their exclusion. As noted, Evidence Code section 915 grants a right of presence to "the person authorized to claim the privilege and such other persons as the person authorized to claim the privilege is willing to have present." (Evid. Code, § 915, subd. (b).) The "holder of the privilege" is authorized to claim the privilege. (*Id.*, § 1014, subd. (a).) As patients without "guardian or conservator," the Menendezes were each "holder[s] of the privilege." (*Id.*, § 1013, subd. (a).) Accordingly, they enjoyed a right of presence. So too did their counsel, whom they were more than willing to have present.

The People then claim that the superior court and this court erred under article I, section 29 of the California Constitution—which provides that "In a criminal case, the people of the State of California have the right to due process of law . . . ." They complain of the fact that the superior court conducted the evidentiary hearing largely in camera outside the presence of

## V

For the reasons stated above, we conclude that the claim of the psycho-therapist-patient privilege must be rejected as to the portion of the audiotape relating to the October 31 and November 2 sessions and sustained as to the portion relating to the November 28 and December 11 sessions.

Accordingly, we affirm the judgment of the Court of Appeal insofar as it affirms the order of the superior court rejecting the claim of privilege as to the portion of the audiotape relating to the October 31 and November 2 sessions. We reverse the judgment of the Court of Appeal insofar as it affirms the order of the superior court rejecting the claim of privilege as to the portion of the audiotape relating to the November 28 and December 11 sessions, and direct the Court of Appeal to remand the cause to the superior court with directions to (1) vacate its order rejecting the claim in this part and (2) enter a new and different order sustaining the claim.

---

their representatives but in the presence of the Menendezes and their respective counsel. They also complain of the fact that we denied their "Motion to Unseal Record on Appeal."

We find no error. True, the People's exclusion limited their participation below, and their ignorance of what transpired has limited their participation here. Yet their position is no different from that of a criminal defendant who is excluded from an in camera hearing on his own motion for the disclosure of the identity of a confidential informant, and who subsequently seeks review of an order denying relief. In each case, the excluded party must do the best he can with the information he has. The trial judge and, later, the appellate court will fill the gaps. (*People* v. *Collins* (1986) 42 Cal.3d 378, 395, fn. 22 [228 Cal.Rptr. 899, 722 P.2d 173] [speaking of the situation on appeal].) In this proceeding, the superior court has done so, and so have we.

The People also claim that at the hearing in camera, the superior court erred by declining to consider certain affidavits allegedly received in evidence, and the Menendezes' counsel committed misconduct by causing the error. Our review of the record does not reveal any misstep by the judge or any impropriety by the attorneys.

Finally, the People claim that the psychotherapist-patient privilege must yield to their interest in successful criminal prosecutions and their state constitutional right to due process of law. We are not persuaded.

As a general matter at least, the privilege appears paramount to prosecution. Certainly, the Legislature is of that view. It has created a so-called "criminal proceeding" exception for the physician-patient privilege. (Evid. Code, § 998 ["There is no [physician-patient] privilege . . . in a criminal proceeding."].) It has not done the same for the psychotherapist-patient privilege. Without doubt, we conclude that the privilege is paramount in this case.

Similarly, as a general matter at least, the privilege does not appear to be "trumped" by the People's state constitutional right to due process. By its very terms, the People's "right to truth-in-evidence" under article I, section 28, subdivision (d) of the California Constitution does not "affect any existing statutory rule of evidence relating to privilege . . . ." Implicit therein is a constitutional determination that the privilege does not undermine the integrity or reliability of the truth-finding function of legal proceedings. From that determination it appears to follow that the privilege does not deny due process. Surely, we cannot conclude that the privilege is "trumped" in this case.

It is so ordered.

Lucas, C. J., Panelli, J., Kennard, J., Arabian, J., Baxter, J., and Ramirez, J.,* concurred.

The petition pf real party in interest for a rehearing was denied November 12, 1992, and the opinion was modified to read as printed above. George, J., did not participate therein.

---

*Presiding Justice of the Court of Appeal, Fourth Appellate District, Division Two, assigned by the Chairperson of the Judicial Council