[Sac. No. 7496. In Bank. Dec. 12, 1963.]

WILLIAM E. WARNE, as Director of Water Resources, Petitioner, v. ROBERT L. HARKNESS, as Director of General Services, Respondent.

Stanley Mosk, Attorney General, F. G. Funke, Assistant Attorney General, Phillip K. Jenson and V. Barlow Goff, Deputy Attorneys General, B. Abbott Goldberg, Elizabeth D. Henderson and Preble Stolz for Petitioner.

Carlson, Collins, Gordon & Bold, Frederick Bold, Jr., and Gerrit Van Benschoten for Respondent.

Charles C. Cooper, Jr., John H. Lauten, Donald J. Whitlock, O'Melveny & Myers, James L. Beebe, Pierce Works, James W. Beebe, and Howard J. Deards as Amici Curiae.

GIBSON, C. J.—The Director of Water Resources seeks a writ of mandate to compel the Director of General Services to comply with an order of the Department of Water Resources to print a resolution of that department concerning various facilities, including a dam, which are to be constructed in the vicinity of Oroville and are designated as the "Oroville Division." The resolution authorizes the issuance of Central Valley Project revenue bonds in the amount of $327,000,000 to meet such costs of features, units, and portions of units of the Oroville Division as are allocable to the generation, transmission and distribution of electric power. It is provided in the resolution that the bonds will be secured by a first lien on the revenues from those facilities. Respondent has refused to print the resolution, claiming that the department has no authority to issue the bonds and that the

use of part of the proceeds in the manner specified is improper.[1]

In adopting its resolution the department relied on the Central Valley Project Act (Wat. Code, § 11100 et seq.), enacted in 1933 and amended frequently thereafter.[2] Under the act the department is empowered to construct and operate various water facilities, among which are those authorized by section 11260 of the Water Code. Section 11260 provides that certain units or portions of units, including the Oroville dam and related power facilities, may be constructed and operated "separate and apart" from other units of the Central Valley Project. The act further empowers the department to issue revenue bonds to carry out the objects of the act and provides that the bonds shall not be obligations of the state but shall constitute a first lien on revenues. (Wat. Code, §§ 11700, 11705, 11720-11722.)

Respondent claims that so far as concerns the department's authority to issue the revenue bonds in question the Central Valley Project Act has been superseded by the California Water Resources Development Bond Act, hereafter called the Burns-Porter Act (Wat. Code, § 12930 et seq.), which was passed by the Legislature in 1959, approved by the voters in 1960, and upheld by this court in *Metropolitan Water Dist.* v. *Marquardt*, 59 Cal.2d 159 [28 Cal.Rptr. 724, 379 P.2d 28].[3] The Burns-Porter Act authorizes the depart-

---

[1]This proceeding was initially commenced against the Director of Finance because his department was then the one required to execute all orders for printing received from the various state agencies. (Gov. Code, § 13570.) His refusal to comply with the order to print the resolutions was based on a statutory provision under which the Department of Finance could decline to execute a printing order which it deemed to be unwarranted by law. (Gov. Code, §13533.) Under a statute which became effective as of October 1, 1963, the duties and powers dealt with in the cited sections were transferred to the Department of General Services. (Gov. Code, § 12980.) The director of the Department of General Services has ratified the position previously taken by the Director of Finance as to this controversy and has, by stipulation of the parties, been substituted as respondent herein.

[2]The Central Valley Project Act was so designated by statute when adopted by the Legislature and approved on referendum in 1933 (Stats. 1933, ch. 1042, pp. 2643, 2664), and, although this title was omitted when the act was subsequently codified, it is still commonly used.

[3]The California Water Resources Development Bond Act provides that it shall be known by that name. (Wat. Code, § 12930.) However, the title "Burns-Porter Act" has also been used (Stats. 1959, Res., ch. 241, p. 5809), and we shall so refer to the legislation for the sake of brevity.

ment to construct and operate the State Water Resources Development System, and to that end provides for the issuance, in an aggregate amount not to exceed $1,750,000,000 of bonds which are of a different type from those authorized by the Central Valley Project Act. (Wat. Code, §§ 12931, 12935, 12938.)

The State Water Resources Development System is to consist of enumerated "State Water Facilities," including the Oroville dam, and of various additional facilities, including those which may now or hereafter be authorized as part of the Central Valley Project. (Wat. Code, §§ 12931, 12934, subd. (d), 12938.) In a general provision the Burns-Porter Act declares that the facilities authorized as part of the Central Valley Project "or facilities which are acquired or constructed ... with funds made available hereunder" shall be "acquired, constructed, operated, and maintained pursuant to the provisions of the code governing the Central Valley Project." (Wat. Code, § 12931.) The Burns-Porter Act makes no specific reference to the authority of the department to issue Central Valley Project bonds.

The bonds authorized by the Burns-Porter Act may be described as general obligation bonds supported by revenue. The full faith and credit of the state is pledged for their payment, and money is to be annually appropriated for that purpose from the General Fund if necessary. (Wat. Code, §§ 12936, 12937, subd. (a).) In connection with the payment of the bonds provision is made for transfers into the General Fund from a special revenue fund, and all revenues from the "State Water Resources Development System," including those from "water or power," are to be deposited in the special fund. (Wat. Code, § 12937, subds. (a) and (b).) That fund is to be used for certain limited purposes and in a listed order of preference in which the annual payment of the Burns-Porter bonds ranks second only to the operation and maintenance of the system. All revenues of the system are declared to constitute a trust fund and are pledged for the purposes and in accordance with the priorities set forth, and the pledge is to be binding on the state so long as any Burns-Porter bonds remain outstanding. (Wat. Code, § 12937, subd. (b).)[4] The California Water Resources Development Fi-

4Subdivision (b) of section 12937 of the Water Code reads as follows: "(b) All revenues derived from the sale, delivery or use of water or power, and all other income or revenue, derived by the State, from the State Water Resources Development System shall be deposited in a

nance Committee, created by the Burns-Porter Act, is empowered to determine, upon the written request of the department, whether bonds authorized by that act should be issued and, if so, in what amount. (Wat. Code, §§ 12933, 12939.)

We reject at the outset the contention of respondent that the Oroville dam, because it is among the facilities enumerated by the Burns-Porter Act as "State Water Facilities," is no longer authorized by the Central Valley Project Act. As we have seen, the Burns-Porter Act expressly con-

special account or accounts in the California Water Resources Development Bond Fund and shall be accounted for and used annually only for the following purposes and in the following order, to wit: 1. The payment of the reasonable costs of the annual maintenance and operation of the State Water Resources Development System and the replacement of any parts thereof. 2. The annual payment of the principal of and interest on the bonds issued pursuant to this chapter. 3. Transfer to the California Water Fund as reimbursement for funds utilized from said fund for construction of the State Water Resources Development System. 4. Any surplus revenues in each year not required for the purpose specified in the foregoing subparagraphs (1), (2) and (3) of this subdivision (b) of Section 12937 and not required to be transferred to the General Fund pursuant to subparagraph (a) of this Section 12937, shall, during the time any of the bonds authorized herein are outstanding, be deposited in a special account in the California Water Resources Development Bond Fund and are hereby appropriated for use and shall be available for expenditure by the department for acquisition and construction of the State Water Resources Development System as described in Section 12931 hereof.

"All such revenues shall constitute a trust fund and are hereby pledged for the uses and purposes above set forth and such pledge shall inure to the direct benefit of the owners and holders of all general obligation bonds issued under this chapter. . . . [Each of the contracts for the sale, delivery, or use of water or power, which the department is empowered to enter into,] shall recite ... that the income and revenues derived from such contracts are pledged to the purposes and in the priority herein set forth. Such pledge of revenues as herein set forth is hereby declared to be and shall constitute an essential term of this chapter and upon its ratification by the people of the State of California shall be binding upon the State so long as any general obligation bonds authorized hereunder are outstanding and unpaid. Such income and revenues, subject to the priorities herein set forth, shall constitute additional security for all of the bonds authorized and issued hereunder irrespective of the date of their issuance and sale and so long as any of the bonds authorized and issued hereunder, or the interest thereon, are unpaid, such income and revenues shall not be used for any other purpose. The bonds authorized hereunder shall be equally secured by a lien upon all income and revenues derived from the State Water Resources Development System without priority for number, amount, date of bonds, of sale, of execution, or of delivery pursuant to this chapter. . . ."

tinues, rather than precludes, the operation of the Central Valley Project Act, and nothing in the Burns-Porter Act shows that a facility authorized as part of the Central Valley Project is no longer to be so regarded merely because it is also enumerated as one of the "State Water Facilities." It should be noted that, although the section of the Central Valley Project Act authorizing the construction of various facilities, including those at Oroville (§ 11260), was amended at the 1959 legislative session after the Burns-Porter Act was passed, no change was made to eliminate from the section the reference to the Oroville facilities. (Stats. 1959, ch. 2043, p. 4723.)

 There is likewise no merit in the assertion that the department's authority to issue Central Valley Project bonds has been terminated by the provision of the Burns-Porter Act under which an indebtedness of $1,750,000,000 may be created by the California Water Resources Development Finance Committee "in the manner and to the extent herein provided, but not otherwise nor in excess thereof." (Wat. Code, § 12935.) This provision was obviously intended only as a limitation with respect to the bonds authorized by the Burns-Porter Act, not with respect to any other bonds.

 The principal problem arises from the fact that, on the one hand, the Central Valley Project Act contains provisions authorizing the construction of the Oroville facilities, the issuance of revenue bonds for that purpose, and the pledging of power revenues from those facilities for the payment of such bonds on a first lien basis, and that, on the other hand, the Burns-Porter Act includes those facilities as part of the State Water Resources Development System and contains provisions which pledge all revenues of that system in such a manner that the payment of the Burns-Porter bonds has a priority second only to maintenance and operation. The question is whether the pledge and priority provisions of the Burns-Porter Act repeal the department's authority to issue the proposed bonds under the Central Valley Project Act or whether, as petitioner urges, the two acts can and should be reconciled by construing the pledge and priority provisions of the Burns-Porter Act as applying to revenues from facilities constructed with funds made available under that act but as having no application to revenues from facilities financed under the Central Valley Project Act.

The pledge and priority provisions in the Burns-Porter

Act, of course, are not to be read by themselves; the act must be considered as a whole. Nothing in it expressly repeals the Central Valley Project Act, and, to the contrary, it expressly continues the Central Valley Project Act in operation without any declaration that the department's authority to issue Central Valley Project bonds is affected. This, therefore, is a case more nearly akin to one where assertedly inconsistent provisions were contemporaneously enacted than to one where it is claimed that a later statute repeals an earlier inconsistent provision.

There are several considerations supporting the view that the Burns-Porter Act was not intended to set forth a complete method of financing to the exclusion of the one provided for in the Central Valley Project Act. The indebtedness of $1,750,000,000 authorized by the Burns-Porter Act represents only an estimate of what will be necessary, and this amount may well prove insufficient to construct all the facilities contemplated by that act. (See *Metropolitan Water Dist.* v. *Marquardt*, 59 Cal.2d 159, 180-181 [28 Cal.Rptr. 724, 379 P.2d 28].) Moreover, the Burns-Porter Act, in specifying that water facilities are to be acquired, constructed, and operated pursuant to the Central Valley Project Act, mentions two separate groups of facilities, those authorized as part of the Central Valley Project and those acquired or constructed "with funds made available hereunder." (Wat. Code, § 12931.) It should also be noted that, although the Legislature did not insert a provision repealing any inconsistent portions of the Central Valley Project Act in passing the Burns-Porter Act, it did insert such a provision at the same legislative session in enacting another law regarding the financing of water facilities, namely, the law establishing the California Water Fund. (Wat. Code, § 12915.)[5] Similarly, the Burns-Porter Act, in incorporating the State General Ob-

[5] We find no merit in an assertion that the repeal provision of the California Water Fund law should in effect be viewed as incorporated in the Burns-Porter Act because the act appropriates money from the California Water Fund for Burns-Porter purposes (§ 12938) and provides for repayment out of revenues from the State Water Resources Development System (§ 12937, subd. (b)(4)). The California Water Fund law (§§ 12910-12915) was enacted as a separate piece of legislation and has importance independent of the Burns-Porter Act, and the latter nowhere incorporates the various provisions of the former. The fact that the Legislature, although appropriating money from the California Water Fund and inserting a repeal provision in the law establishing that fund at the same legislative session, omitted such a provision from the Burns-Porter Act makes the omission even more significant with respect to the problem before us.

ligation Bond Law, declares that it does so insofar as "it is not inconsistent with the express provisions of this chapter" (Wat. Code, § 12932) whereas no such declaration is set forth in the portion of the act making the Central Valley Project Act applicable.

The parties have discussed various facts relating to the history of the Burns-Porter Act which are not helpful here because, considered as a whole, they are consistent with either view on the question whether the Burns-Porter Act was intended to repeal the authority to issue Central Valley Project bonds.[6] Nor can we be influenced in resolving the problem before us by the conflicting assertions of the parties with respect to matters of fiscal policy. It would be both difficult and inappropriate for a court to decide this type of case on the basis of its opinion as to which method of financing is best in the light of policy considerations like those in dispute here.[7]

In determining whether the Burns-Porter Act supersedes any of the provisions in the Central Valley Project Act or whether the two acts may be harmonized, we must, of course, consider pertinent rules of statutory construction. ▮ Even where one of two inconsistent statutes is later than the other and, unlike the present situation, does not purport to

---

[6]The ballot pamphlet submitted to the voters in connection with their approval of the Burns-Porter Act in 1960 was silent as to the effect of that act on the department's authority to issue Central Valley Project bonds and did not contain any reference to the pledge of revenues in the act or the priorities there set forth.

For proposals and resolutions introduced in the Legislature in 1959 and 1963 see: Assembly Journal, vol. 4, Reg. Sess., June 17, 1959, pp. 5656-5657, 5659-5660; Final Calendar of Legislative Business, 1963, Senate Final History, pp. 283, 472, 495, Assembly Final History, p. 556. For conflicting opinions by the Attorney General and the Legislative Counsel see: 36 Ops.Cal.Atty.Gen. 160 (1960); Opinion of Legislative Counsel, No. 11246, March 25, 1963.

[7]Petitioner, for example, claims that, if the bonds in question cannot be issued and Burns-Porter bonds must be used instead, there will be a drain on the General Fund for the payment of interest on the Burns-Porter bonds in the amount of $75,000,000 between now and 1970 and that the inability to issue Central Valley Project bonds will impair the state's credit. Respondent takes the position that, because resort to the General Fund for payment of the Burns-Porter bonds is contemplated by the act, there is nothing undesirable in borrowing from the General Fund for that purpose if necessary, and he not only denies that issuance of Central Valley Project bonds will protect the credit standing of the state but asserts that this method of financing will impair the state's credit and increase the cost of water development,

continue the other in operation, it is settled that there is a presumption against repeal by implication, that to overcome the presumption the two acts must be irreconcilable, clearly repugnant, and so inconsistent as to prevent their concurrent operation, and that the courts are bound to maintain the integrity of both statutes if they may stand together. (E.g., *Penziner* v. *West American Finance Co.*, 10 Cal.2d 160, 176 [74 P.2d 252]; *City of Burbank* v. *Metropolitan Water Dist.*, 180 Cal.App.2d 451, 462 [4 Cal.Rptr. 757].) There is obviously more reason to reject a claim of implied repeal where, as here, the later act does purport to continue the earlier one in operation. (See 2 Sutherland on Statutory Construction (3d ed. 1943) § 5205, pp. 544-545.)[8] ▉ Also of importance here is the rule that where the same subject matter is covered by inconsistent provisions, one of which is special and the other general, the special one, whether or not enacted first, is an exception to the general statute and controls unless an intent to the contrary clearly appears. (*In re Williamson*, 43 Cal.2d 651, 654 [276 P.2d 593]; see 82 C.J.S. 720-722.) The pledge provisions of the Central Valley Project Act deal specially with the subject of how the revenue from the facilities authorized by that act may be pledged, whereas the pledge provisions of the Burns-Porter Act are more general in character because they apply to the whole State Water Resources Development System, of which the Central Valley Project facilities are to be only a part under the terms of the act. (Wat. Code, § 12931.)

▉ In the light of the statutory provisions before us and the established rules of construction, we conclude that the pledge and priority provisions of the Burns-Porter Act do not repeal the provisions in the Central Valley Project Act relating to the issuance of Central Valley Project bonds and the pledging of the revenues for the payment of such bonds. It merits emphasis in this connection that, since no

---

[8]Sutherland states: "Experience indicates that a legislature does not deliberately enact inconsistent provisions when it is cognizant of them both, without expressly recognizing the inconsistency. Thus, in the absence of any recognition of an inconsistency by repealing or amending, it is reasonable to assume that the legislative policy embodied in provisions enacted at the same time and relating to the same subject matter *or in provisions the later of which refers to the prior* and both of which concern the same subject matter is the same and that the provisions are consistent. And if a provision is ambiguous, it should be construed with those acts relating to the same subject matter which were enacted with it or to which it referred or which refer to it." (Italics added.)

Burns-Porter bonds have been sold, there are not yet any Burns-Porter bondholders whose rights will be affected by the manner in which we have construed the statutes and that, so far as concerns such bondholders in the future, the meaning of the applicable law will have been made clear by our decision.

A matter to be considered is whether the two acts are to be harmonized in such a manner that all the revenues from facilities financed with Central Valley Project bonds are removed from the operation of the pledge and priority provisions of the Burns-Porter Act or whether only so much of those revenues is removed as is necessary to service Central Valley Project bonds and meet the expenses of the facilities thus financed, leaving any surplus of revenue subject to the Burns-Porter Act. This point has been raised by amicus curiae, Metropolitan Water District of Southern California, one of several contractors with which the department has entered into contracts for the sale of water under the Burns-Porter Act. Metropolitan urges that in reconciling the two acts we should hold that surplus revenues from facilities financed with Central Valley Project bonds remain subject to the pledge and priority provisions of the Burns-Porter Act.

The Central Valley Project Act contains several provisions concerning the disposition of surplus revenues which leave the matter to the discretion of the department so long as the surplus is used for one of certain specified Central Valley Project purposes or for some other purpose incidental to the project (Wat. Code, §§ 11842, 11140, 11830, 11832). These are important provisions which cannot properly be disregarded unless a contrary legislative intent clearly appears. There is no specific language in the Burns-Porter Act overriding them, and an intent to repeal does not appear as to them any more than as to the provisions authorizing the issuance of Central Valley Project bonds. If, as contended by Metropolitan, there are strong policy considerations for making the surplus subject to the pledge and priority provisions of the Burns-Porter Act, the Legislature can, should it agree with Metropolitan, adopt appropriate legislation to that end, but such considerations do not justify a departure by this court from the statutes as they now read. Under the present provisions we are satisfied that once we have concluded that the Burns-Porter Act does not repeal the provisions of the Central Valley Project Act relating to the issuance of bonds and the pledging of revenues for their payment, there is no

sound reason to hold that the surplus is nevertheless subject to the Burns-Porter Act rather than to the Central Valley Project Act.

■ There is no merit in a further contention of Metropolitan that the application of the Burns-Porter Act to the surplus revenues is required by the terms of Metropolitan's contract with the department. It is asserted that the failure to apply the Burns-Porter pledge to the surplus revenues from the Oroville power facilities will seriously impair the ability to finance certain facilities authorized by the Burns-Porter Act in addition to state water facilities, namely, those additional facilities to augment the supply of water in the Delta (Wat. Code, § 12938), and that therefore any diversion of the surplus revenue would constitute a breach of the department's implied covenant to act in good faith. No provision of the contract, however, specifically pledges this surplus revenue to the construction of the additional facilities or any facilities. The only general provision cited by Metropolitan that could conceivably have that effect is article 6(c) which reads, *"Subject to the availability of funds*, the State shall make all reasonable efforts consistent with sound fiscal policies ... to complete the project facilities necessary"* to make and continue water deliveries in the amounts agreed upon in the contract. (Italics added.) Obviously, in the absence of a showing that the additional facilities would be necessary within the meaning of article 6(c) and that they could not be constructed without the surplus revenue from the Oroville power facilities, this provision does not justify a conclusion that the department would be acting in bad faith in the event it does not treat the surplus as subject to the Burns-Porter Act. It should also be noted that the provision is conditioned upon the availability of funds.

Metropolitan also contends that a limitation which must be imposed on the issuance of Central Valley Project bonds is that such bonds may only be used to "supplement" not to "replace" the financing made available by the Burns-Porter Act. There is no claim that the bonds in question are designed to "replace" any Burns-Porter financing, and even if the limitation urged could be read into the statutes, the only specific matter Metropolitan appears to ask us to decide in this connection is one as to which a determination is not called for in this proceeding, namely, that money from the California Water Fund cannot be diverted to purposes not connected with the water system. It is asserted that, if we do

not so decide, there is a danger that the department and the Legislature, acting together, will substitute Central Valley Project bonds for California Water Fund money in order to use the latter for nonwater purposes. The money in the California Water Fund is appropriated in general terms by the Burns-Porter Act for the purposes of that act but with an important exception reserving power in the Legislature. (Wat. Code, § 12938.)[9] The question before us, of course, is whether Central Valley Project bonds may be issued, and a determination concerning the Legislature's power with respect to the California Water Fund would not depend upon whether Central Valley Project bonds can be used but upon the terms of the statutory exception reserving power in the Legislature. It does not follow that money from the California Water Fund will be diverted merely because Central Valley Project bonds are issued, and, if the Legislature has power under the statute to divert money from the California Water Fund, it can do so without regard to the kind of bonds used.

Based on its contract with the department, Metropolitan urges that this court decide two points which, although they may have merit, need not be decided here. One contention is that if the issuance of Central Valley Project bonds is permitted, the rate of interest to be paid on such bonds cannot be used in the determination of the "project interest rate," which under the contract is a factor in the calculation of the charges to be paid by Metropolitan for the purchase of water. The other contention is that the issuance of Central Valley Project bonds should not be allowed to alter Metropolitan's contractual right to certain power credits which have the effect under the contract of reducing the charges for water. There is no indication that the department disagrees with Metropolitan's interpretation of the contract, and Metropolitan does not show how these matters, whatever their merit, could affect the department's right to issue Central Valley Project bonds. Should a controversy arise after such bonds are issued, Metropolitan would be adequately protected by an

---

[9]Section 12938 provides in part: "All moneys in the California Water Fund ... are hereby appropriated to the department for expenditure and allocation by the department without regard to fiscal years for the State Water Resources Development System ... except that in any fiscal year the Legislature may appropriate for any lawful purpose any money in the California Water Fund which is unexpended at the beginning of that fiscal year. ..."

appropriate proceeding to assert its rights under the contract.

We come now to a question raised by respondent which does not relate to whether the Burns-Porter Act has superseded the Central Valley Project Act. It is asserted that the resolution is in part contrary to the Central Valley Project Act because of the purpose for which a portion of the bond issue is proposed.

The bond issue, as we have seen, is to be in the amount of $327,000,000, and there is no dispute as to the use of most of that sum, about $270,000,000, which will be devoted to meet costs to be incurred in connection with the power facilities *after* issuance of the bonds. However, the resolution also provides that an amount of the proceeds of the bonds equal to the total of the amounts from other sources *previously* expended for the construction of the power facilities, but not in excess of $57,000,000, may be expended for construction of facilities of the Oroville Division other than the power facilities and shall be deemed to have been expended for the construction of the power facilities. Respondent challenges this provision of the resolution so far as it concerns $55,000,000. As to the remaining $2,000,000 of the $57,000,000 limitation mentioned in the provision, he does not, and cannot properly, make any objection because the Legislature, in making certain appropriations totaling $2,000,000 for Central Valley purposes, expressly provided that this amount was to be returned to the General Fund from proceeds of the first sale of Central Valley Project bonds, which is the one now being proposed. (Wat. Code, § 11714; Stats. 1953, ch. 3, pp. 68-69, item 262; Stats. 1953, ch. 971, pp. 2411-2412, item 253; Stats. 1955, ch. 1, pp. 66-67, item 249.)

Under the resolution the total amount of the bonds is based solely on the costs, past and future, of the Oroville Division which are apportioned to the *power* facilities. The bonds are secured by a lien on all revenues of the power facilities and not merely on the revenues attributable to power facilities to be constructed in the future.

We are satisfied that the approach taken in the resolution is in accord with the authority conferred upon the department by the Central Valley Project Act. The treatment of the Oroville power facilities as separate and the apportionment of costs to those facilities on a reasonable basis is authorized by section 11260 of the Water Code, which, as we have seen, provides that portions of certain units of the Central Valley

Project, including the Oroville Division, may be constructed, maintained, and operated by the department "separate and apart" from other units. The issuance of some of the bonds to meet the department's prior costs of construction comes within the authorization set forth in section 11750. That section empowers the department to issue bonds to obtain sufficient funds "for the construction of the project and to pay all costs and expenses, including interest due and payable, prior to and during the period of actual construction thereof. ..." (See also Wat. Code, § 11761, subds. (a), (c), and (e) [containing similar language as to the use of bond proceeds].) A limitation that respondent would have us read into section 11750, namely, that it does not apply to construction costs incurred before authorization of bonds, would not only be contrary to the broad, unqualified language of the provision but would create an anomalous situation in view of other statutes relating to the Central Valley Project. Section 11805 specifically authorizes the department to disburse bond proceeds to meet costs which might well be incurred and paid before the bonds are authorized, namely, costs of surveys, plans, and estimates "incidental to the issuance ... of bonds." Moreover, as noted above, the Legislature in making various appropriations for the Central Valley Project has expressly provided that the amount of those appropriations are to be returned out of proceeds from the first sale of Central Valley Project bonds.

It should be pointed out that the issuance of some of the bonds to meet prior costs incurred by the department is not contrary to section 11139 since this section was designed to prevent reimbursement for contributions made to the Central Valley Project by state agencies other than the department and not to deal with the department's use of funds under its own control.[10] Nothing in the resolution indicates that the department proposes to use any of the bond proceeds to make repayments to any other state agency.

■ There is no merit in respondent's contention that the resolution fails to comply with section 11701 of the Water

---

[10]Section 11139 reads: "The department may enter into an agreement with any state agency to repay any money or the value of any rights of way, labor, materials, or other property advanced or contributed; but no repayment therefore shall be made until all obligations issued by the department for the construction of the project have been fully redeemed and paid, and then only out of the revenues received from the operation of the project."

Code, which requires the making of cost estimates as a basis for the issuance of Central Valley Project bonds.[11] The resolution in stating that an amount not to exceed $57,000,000 may be used for Oroville purposes other than power does not set forth cost estimates as to those purposes. However, the total amount of the proposed bonds, as we have seen, is based solely on the costs of the Oroville Division apportioned to the power facilities, and the bonds are to be issued for these apportioned costs, with none of the proceeds to be considered as used for other facilities. The resolution contains estimates of all the costs of the power facilities including, of course, costs incurred prior to issuance of the bonds. Under these circumstances there is no occasion for the resolution to set forth cost estimates with respect to Oroville purposes other than power.

Let a peremptory writ of mandate issue.

Traynor, J., Schauer, J., McComb, J., Peters, J., Tobriner, J., and Peek, J., concurred.

---

[11]Section 11701 of the Water Code reads: "Whenever the department determines that it is necessary to carry out any of the objects and purposes of this part, it shall prepare preliminary cost estimates, an estimate of the amount required to be raised for such purposes by the issuance of revenue bonds, and a statement of the probable amount of money, property, materials, or labor, if any, to be contributed from other sources in aid thereof, and shall adopt a resolution declaring that the public interest and necessity require the carrying out of such objects and purposes and authorizing the issuance of revenue bonds for the purpose of obtaining funds in an amount not in excess of that estimated to be required for such purposes."