[No. S073888. Nov. 1, 1999.]

ELLEN MILLER, Petitioner, v.
THE SUPERIOR COURT OF SAN JOAQUIN COUNTY, Respondent;
THE PEOPLE, Real Party in Interest.

## COUNSEL

Diepenbrock, Wulff, Plant & Hannegan, Samuel T. McAdam; Riegels Campos & Kenyon and Charity Kenyon for Petitioner.

Crosby, Heafey, Roach & May, John E. Carne, Kathy M. Banke, David E. Durant and Helen N. E. Posnansky for California Newspaper Publishers Association, California First Amendment Coalition, The Society of Professional Journalists, Northern California Chapter, The Copley Press, Inc., Freedom Communicaitons, Knight Ridder, McClatchy Newspapers, Inc., the Ontario Bulletin, the San Francisco Examiner, the San Francisco Chronicle, the San Bernardino Sun, the Santa Rosa Press Democrat and The Times Mirror Company as Amici Curiae on behalf of Petitioner.

Johanson & Robinson and Steve H. Johanson for Hearst-Argyle Television, Inc., A. H. Belo Corporation and Channel 58, Inc., as Amici Curiae on behalf of Petitioner.

No appearance for Respondent.

Daniel E. Lungren and Bill Lockyer, Attorneys General, George Williamson and David P. Druliner, Chief Assistant Attorneys General, Robert R. Anderson, Assistant Attorney General, Edmund D. McMurray, Margaret Venturi and Susan J. Orton, Deputy Attorneys General, for Real Party in Interest.

Gil Garcetti, District Attorney (Los Angeles), George M. Palmer, Head Deputy District Attorney, and Brentford J. Ferreira, Deputy District Attorney, for California District Attorneys Association as Amicus Curiae on behalf of Real Party in Interest.

## OPINION

MOSK, J.—In 1990 the voters of this state enacted a constitutional amendment as part of Proposition 115 affirming that in criminal cases the people of the State of California have "the right to due process of law" (Cal. Const., art. I, § 29).[1] In the present case, we consider whether the assertion of that state constitutional right by a district attorney can serve as a justification for holding a newsperson in contempt for refusing to surrender unpublished information, in spite of the newsperson's immunity from contempt for such refusal expressly provided in article I, section 2, subdivision (b) (hereinafter article I, section 2(b)), and reaffirmed in article I, section 28, subdivision (d) (hereinafter article I, section 28(d)). We conclude that a newsperson cannot be held in contempt under these circumstances. We therefore reverse the judgment of the Court of Appeal.

---

[1]All references to articles hereafter will be to articles of the California Constitution unless otherwise indicated.

## I. Facts and Procedural History

The pertinent facts of this case are not in dispute and were largely set forth in *SCI-Sacramento, Inc.* v. *Superior Court* (1997) 54 Cal.App.4th 654, 657-659 [62 Cal.Rptr.2d 868]:

"KOVR is a television station engaged in the gathering, receiving and processing of information for communication to the public. After learning that one Anthony Lee DeSoto had confessed to sheriff's investigators that he had killed his cellmate, KOVR news reporter Tom Layson conducted a videotaped interview with DeSoto in the San Joaquin County jail.

"Portions of the interview were broadcast on KOVR news programs on March 19 and March 20, 1996.

"In April 1996, the People issued a subpoena duces tecum for KOVR's custodian of records to 'Bring Tape Recording of the Entire Interview at the San Joaquin County Jail of Defendant Anthony Lee De[S]oto on 3/19 or 3/20/96, to Include Portions of Broadcast as Well as Portions That Were Not Broadcasted [*sic*].' The subpoena indicated no appearance was required if the materials were turned over to the prosecution.

"KOVR submitted only the broadcast portions of the interview, invoking the . . . shield law (Cal. Const., art. I, § 2; Evid. Code, § 1070)[2] as to the 'outtakes' which were not broadcast. The prosecutor reiterated her demand for the unpublished materials.

"In June 1996, KOVR moved to quash the subpoena on the grounds of the . . . shield law. KOVR's motion requested that the subpoena be quashed but asked in the alternative: 'If the court should determine that the District Attorney has established and produced evidence of a colorable interest in this matter, KOVR requests that the court review in camera those portions of the videotape claimed to be essential to protecting the interests of the People. Such in camera review of the unpublished material, with counsel for the media present, would be essential to perform the balancing of the nature described in *Delaney* [v. *Superior Court* (1990) 50 Cal.3d 785 [268 Cal.Rptr. 753, 789 P.2d 934]]. [¶] If the court should determine that . . . the District Attorney has established a right to production of the portions of the video-tape that have not been broadcast, then in camera review is requested

---

[2]The shield law is found in almost identical versions in both the state Constitution and the Evidence Code. For the sake of convenience, and because the crux of the case is the relation between various state constitutional provisions, we will generally refer solely to the constitutional provision.

without prejudice to the right of KOVR's custodian of records to review the court's ruling and to decide whether or not to disclose the unbroadcast portions of the videotape or to suffer a judgment of contempt.'. . .

"At the July 8, 1996, hearing on the motion to quash, the trial court stated (in concurrence with the position taken in the People's opposition to the motion to quash) that the case law requires in camera review only when the material sought to be shielded under the newspersons' shield law is confidential or sensitive—elements not present in the instant case, where KOVR has not contended the unpublished tape is confidential or sensitive. The court further stated that notwithstanding this point of law, the court would exercise its discretion and review the tape in camera. The court asked KOVR's counsel if she had the tape (exhibit C) with her. She did, and she turned it over to the court. The court conducted the in camera review in the presence of KOVR's counsel, defendant, and defense counsel. KOVR's counsel stated she had no objection to the presence of the defense '[a]s long as it would not constitute a waiver of the Shield Law . . . .' The trial court agreed.

"On July 19, 1996, the trial court issued an order denying KOVR's motion to quash, ordering that the videotape (exhibit C) be unsealed (but staying its order), and directing KOVR to provide a copy of the unedited interview to the prosecution. There are two versions of the court order—a sealed version which has not been provided to the People, and an unsealed version. Both versions of the order stated in part: 'The court hereby denies KOVR's Motion to Quash and orders that EXHIBIT C be unsealed, but stays the execution of that order until the next hearing on this matter set for July 23, 1996. KOVR is further ordered to provide a complete copy of the unedited interview in continuous sequence at the July 23, 1996 hearing.' " (*SCI-Sacramento, Inc.* v. *Superior Court, supra,* 54 Cal.App.4th at pp. 657-659, fns. and italics omitted.)

The stay was extended when KOVR indicated its intention to petition the Court of Appeal for an extraordinary writ setting aside the superior court's ruling. That petition was filed in that court on August 14, 1996. In *SCI-Sacramento, Inc.* v. *Superior Court, supra,* 54 Cal.App.4th 654, the Court of Appeal concluded the petition was premature as there had been no adjudication of contempt. The court therefore did not reach the merits of the dispute but issued a peremptory writ of mandate directing the superior court to vacate its order and "to enter a new order giving petitioners the opportunity to choose to be held in contempt or to disclose the disputed materials." (*Id.,* at pp. 667-668.) The previously issued stay was dissolved. (*Id.,* at p. 668.)

At the ensuing hearing, the superior court ordered petitioner, KOVR's news director, Ellen Miller, to turn over to the prosecution the unedited

videotape. Petitioner refused to do so and was adjudged in contempt. The court ordered petitioner jailed until the tape was produced or the criminal proceedings concluded. She was also ordered to pay the reasonable attorney fees and costs incurred in connection with the contempt proceedings. However, the court stayed its order to allow filing of a petition for extraordinary relief in the Court of Appeal. Petitioner filed such a petition for "a writ of habeas corpus and/or review," which the court treated as a writ of prohibition. The Court of Appeal issued an alternative writ of prohibition and stayed the judgment of contempt.

The Court of Appeal, relying on article I, section 29, giving "the people of the State of California . . . the right to due process of law," and on our decision in *Delaney* v. *Superior Court* (1990) 50 Cal.3d 785 [268 Cal.Rptr. 753, 789 P.2d 934] (*Delaney*), concluded that a journalist's immunity from contempt is not absolute when the prosecution makes a showing of need for information the journalist possesses. Purportedly following our *Delaney* decision, the court employed a balancing test, weighing the relative importance of the prosecution's interest in uncovering the information and the news organization's interest in keeping it concealed. The court determined that the People had shown the potential importance of the unpublished portions of the interview for the criminal trial against DeSoto and the lack of alternative sources. The court also determined that the concealment of the information was of relatively less importance to the news organization, because it was not protecting a confidential source. The court accordingly upheld the trial court's contempt order, denied the writ of prohibition, and lifted the stay.

We granted review and further stayed enforcement of the contempt order.

## II. Discussion

■ The shield law, article I, section 2(b), enacted in its constitutional form in 1980, provides that a newsperson "shall not be adjudged in contempt . . . for refusing to disclose the source of any information procured while so connected or employed [as a newsperson] . . . or for refusing to disclose any unpublished information obtained or prepared in gathering, receiving or processing of information for communication to the public." "Stated more simply, article I, section 2(b) protects a newsperson from being adjudged in contempt for refusing to disclose either: (1) unpublished information, or (2) the source of information, whether published or unpublished." (*Delaney*, *supra*, 50 Cal.3d at pp. 796-797, fn. omitted.)

The shield law is, by its own terms, *absolute* rather than qualified in immunizing a newsperson from contempt for revealing unpublished information obtained in the newsgathering process. As we have explained:

" 'Since contempt is generally the only effective remedy against a nonparty witness, the California enactments [article I, section 2(b) and Evidence Code section 1070] grant such witnesses *virtually absolute protection* against compelled disclosure.' [Citation.] We implicitly reached the same conclusion in *Delaney, supra,* 50 Cal.3d 785, in which we held that a criminal defendant's federal constitutional right to a fair trial may in some cases overcome a claim of immunity under the state shield law. *(Id.,* at p. 805.) If the shield law itself provided for a balancing approach, i.e., a qualified immunity, there would have been no need for us to turn to the federal Constitution . . . . We find nothing in the shield law's language or history to suggest the immunity from contempt is qualified such that it can be overcome by a showing of need for unpublished information within the scope of the shield law." *(New York Times Co.* v. *Superior Court* (1990) 51 Cal.3d 453, 461 [273 Cal.Rptr. 98, 796 P.2d 811], fn. omitted.)

Nonetheless, as the above suggests, the protection of the shield law must give way to a conflicting federal constitutional right of a criminal defendant. As we stated in *Delaney*: "[T]he shield law's protection is overcome in a criminal proceeding on a showing that nondisclosure would deprive the defendant of his federal constitutional right to a fair trial. Although this court has not decided a case involving the application of the shield law in a criminal prosecution, the principle is beyond question. [Citations.] The incorporation of the shield law into the California Constitution cannot restrict a criminal defendant's *federal* constitutional right to a fair trial. [Citations.] Such result would violate the supremacy clauses of the federal and state Constitutions." *(Delaney, supra,* 50 Cal.3d at pp. 805-806, fns. omitted.)

█ At issue in *Delaney* was whether a criminal defendant could, pursuant to the right to a fair trial under the due process clause of the Fourteenth Amendment of the United States Constitution *(Delaney, supra,* 50 Cal.3d at pp. 805-806, fn. 18), compel the testimony of a newspaper reporter who had been a percipient witness to his arrest. In *Delaney*, the court formulated a two-stage inquiry to determine whether a court's contempt power could be invoked to enforce a criminal defendant's subpoena against a newsperson, the shield law notwithstanding. At the threshold, the defendant must show "a reasonable possibility [that] the information will materially *assist his defense.*" *(Id.,* at p. 809.) If he makes this showing, then the court is to proceed to the second stage of the inquiry and balance the criminal defendant's and the newsperson's rights, considering whether the unpublished information in question is confidential or sensitive, the degree to which the information is important to the criminal defendant, whether there is an alternative source of unpublished information, and whether there are other circumstances which

may render moot the need to avoid disclosure. (*Id.*, at pp. 810-812.) Applying this test to the facts of the case, we concluded that the defendant was entitled to the information because the reporter's eyewitness testimony was not sensitive or confidential, because such testimony would likely be determinative of the outcome of the defendant's case, and because there was no meaningful alternative to that testimony. (*Id.*, at pp. 814-816.)

 The Court of Appeal in the present case held that the people's "right to due process of law," incorporated in article I, section 29, requires that the prosecution's interest in obtaining relevant evidence be balanced against the newsperson's immunity from contempt under the shield law in the same manner as in *Delaney*. Of course, article I, section 29, is a state constitutional provision, not a federal one, and no supremacy clause issue is presented. But it is nonetheless the case that both provisions have equal dignity as constituents of the state Constitution. As such, the provisions must be harmonized if possible (see *City and County of San Francisco v. County of San Mateo* (1995) 10 Cal.4th 554, 563 [41 Cal.Rptr.2d 888, 896 P.2d 181]), or, if there is a conflict between the shield law and article I, section 29, then that conflict must be resolved in some manner. The Court of Appeal found such a conflict and held that *Delaney* provides the means for resolving it.

The Court of Appeal's holding, of course, presupposed that there is a conflict between the shield law and article I, section 29, in need of resolution. In order to determine whether this is so, we must inquire into what was meant, or not meant, by the phrase "the people . . . have the right to due process of law" in article I, section 29. As stated, that constitutional provision was part of Proposition 115, enacted by the voters in June 1990, which made a number of changes to the Penal Code and the criminal justice system. The provisions of Proposition 115 were reviewed at length in *Raven v. Deukmejian* (1990) 52 Cal.3d 336, 342-346 [276 Cal.Rptr. 326, 801 P.2d 1077]. Entitled the "Crime Victims Justice Reform Act," Proposition 115 included such provisions as more expansive rules for allowing joinder of criminal defendants, reciprocal discovery for the prosecution and the defense, voir dire conducted initially by the court rather than by the parties, augmentation of the felony-murder and special circumstance statutes, and certain measures to discourage delays in bringing cases to trial. Proposition 115 also included a provision mandating that criminal defendants' constitutional rights not be construed to be greater than those afforded under the United States Constitution, a provision we held to be an unconstitutional revision of the California Constitution. (*Raven v. Deukmejian, supra,* 52 Cal.3d at p. 355.)

 Article I, section 29, as stated, adds to these specific reform measures the statement: "In a criminal case, the people of the State of California

have the right to due process of law and to a speedy and public trial." The term "due process of law" is not defined.

The relationship between a prosecutorial right to obtain relevant evidence and the various evidentiary privileges and immunities of the press was not addressed in Proposition 115. The closely related subject of the relationship between the right to *admit* relevant evidence and such evidentiary privileges and immunities was treated in an earlier anticrime initiative, Proposition 8, enacted in June of 1982. Like Proposition 115, Proposition 8 consisted of a number of reforms of the criminal justice system, including provisions on victim's restitution, rules for granting bail, abolition of the diminished capacity defense, enhancement of sentences for habitual criminals, and curtailment of plea bargaining. (See *Brosnahan* v. *Brown* (1982) 32 Cal.3d 236, 242-245 [186 Cal.Rptr. 30, 651 P.2d 274].) The so-called "truth-in-evidence" provision of Proposition 8, found at article I, section 28(d), states: "Except as provided by statute hereafter enacted by a two-thirds vote of the membership in each house of the Legislature, relevant evidence shall not be excluded in any criminal proceeding, including pretrial and post conviction motions and hearings, or in any trial or hearing of a juvenile for a criminal offense, whether heard in juvenile or adult court. Nothing in this section shall affect any existing statutory rule of evidence relating to privilege or hearsay, or Evidence Code, Sections 352, 782 or 1103. *Nothing in this section shall affect any existing statutory or constitutional right of the press.*" (Italics added.)

There is no disputing that article I, section 28(d)'s exemptions include the "right" to withhold unpublished information obtained in the newsgathering process pursuant to the protection of the shield law. The enactment of the shield law predated the passage of Proposition 8, and therefore the right derived from that law is an "existing . . . constitutional right of the press" within the meaning of article I, section 28(d). Consequently, under the terms of article I, section 28(d), however broadly the right to admit evidence is construed to include the right to obtain such evidence, that right would not include a right to compel a newsperson to surrender unpublished information by invoking the court's power of contempt. The question then is whether article I, section 29 implicitly expanded the scope of the prosecutor's right to obtain evidence to permit what was forbidden under article I, section 28(d).

We implicitly repudiated such an expansive reading of article I, section 29 in *Menendez* v. *Superior Court* (1992) 3 Cal.4th 435, 456-457 [11 Cal.Rptr.2d 92, 834 P.2d 786], footnote 18. That case involved the prosecution's access to audiotapes containing confidential material assertedly protected by the defendants' psychotherapist-patient privilege. The prosecution claimed "that the psychotherapist-patient privilege must yield to their

interest in successful criminal prosecutions and their state constitutional right to due process of law." (*Ibid.*) We rejected that argument. As we stated: "[A]s a general matter at least, the privilege does not appear to be 'trumped' by the People's state constitutional right to due process. By its very terms, the People's 'right to truth-in-evidence' under article I, section 28, subdivision (d) of the California Constitution does not 'affect any existing statutory rule of evidence relating to the privilege . . . .' Implicit therein is a constitutional determination that the privilege does not undermine the integrity or reliability of the truth-finding function of legal proceedings. From that determination it appears to follow that the privilege does not deny due process." (*Ibid.*)

Similarly, under article I, section 28(d), the People's "right to truth-in-evidence" does not affect "any existing statutory or constitutional right of the press." Implicit in this conclusion is a constitutional determination that such rights, including that provided by the shield law, "do[ ] not undermine the integrity or reliability of the truth-finding function of legal proceedings. From that determination it appears to follow that the [shield law] does not deny due process." (*Menendez* v. *Superior Court, supra,* 3 Cal.4th at p. 457, fn. 18.)

The Court of Appeal, in concluding to the contrary that invocation of the shield law would deny due process to the People in this case, attempted to distinguish *Menendez* as follows: "The media exception in article I, section 28(d) is expressly confined to 'this section,' i.e., section 28. Section 28(d) addresses the right to present evidence at trial. To interpret article I, section 28(d) as qualifying the People's right to due process is inconsistent with the reasoning of the court in *Delaney.* Article I, section 28(d) applies to both the prosecution and the defense. Hence, if it limits the prosecution's due process rights, it necessarily limits the defendant's rights as well. Although the holding in *Delaney* was based on a *federal* due process claim, which article I, section 28(d) cannot limit, the reasoning of the court was not based on the supremacy of federal over state law but on a balance of competing rights. *Delaney* did not hold the state constitutional shield law must yield to the defendant's federal constitutional due process right as a matter of federal supremacy. It had to yield because in the balance of competing interests, the defendant's federal due process rights outweighed the rights protected by the shield law. In other words, the application of the shield law in that case would 'undermine the integrity or reliability of the truth-finding function.' (*Menendez* v. *Superior Court, supra,* 3 Cal.4th at p. 457, fn. 18.)"

The Court of Appeal misapprehended our reasoning both in *Delaney* and in *Menendez.* In *Delaney,* we had to resolve a conflict between a federal

constitutional right and a state constitutional right. The *Delaney* court concluded that the nature of the federal due process right, in the context of compelling witness testimony, is not so absolute as to preclude a balancing of the respective rights if they conflict. But there is no need to balance the two rights if they are not in conflict. In *Menendez* we concluded that whatever "the people['s] . . . right to due process of law" in article I, section 29 might mean, in light of article I, section 28(d), it specifically does not mean a right of access to evidence in contravention of previously existing evidentiary privileges and immunities, which include those given to the press. Therefore, there is no conflict between the shield law and the subsequently enacted people's right to due process of law, and accordingly, no need to engage in the balancing of interests prescribed by *Delaney*. Our statement in *Menendez* does not conflict with our holding in *Delaney* because the exemptions set forth in article I, section 28(d) do not affect a criminal defendant's federal constitutional rights to obtain evidence, which was at issue in the latter case.

■ To state the matter in other terms, " 'It is well settled . . . that a general provision is controlled by one that is special, the latter being treated as an exception to the former. A specific provision relating to a particular subject will govern in respect to that subject, as against a general provision, although the latter, standing alone, would be broad enough to include the subject to which the more particular provision relates.' " (*San Francisco Taxpayers Assn.* v. *Board of Supervisors* (1992) 2 Cal.4th 571, 577 [7 Cal.Rptr.2d 245, 828 P.2d 147]; see also *Salazar* v. *Eastin* (1995) 9 Cal.4th 836, 857 [39 Cal.Rptr.2d 21, 890 P.2d 43].) This principle applies whether the specific provision was passed before or after the general enactment. (*Warne* v. *Harkness* (1963) 60 Cal.2d 579, 588 [35 Cal.Rptr. 601, 387 P.2d 377].) ■ In the present case, even if we were to assume that the people's right to due process of law encompasses a right to obtain and admit evidence, the precise content of that right, and the particular exemptions that apply to it, would be presumably congruent with the specific truth-in-evidence provision found in article I, section 28(d). It is doubtful indeed that the generally worded section 29 impliedly permits what section 28(d) explicitly precludes, i.e., using the prosecutorial need for relevant evidence as a justification for overriding existing evidentiary privileges and rights of the press.

Moreover, the rule that the general law is governed by the specific also applies to the relationship between the shield law itself, article I, section 2(b), and the people's right to due process. The former specifically provides an absolute immunity from contempt for journalists who refuse to furnish unpublished information. We presume that this specific provision was not

altered or partially repealed by the general recognition of the people's right to due process later added to the Constitution.

The presumption that a specific governs a general enactment may, of course, be rebutted by evidence of a contrary intent of the Legislature or, as in this case, of the electorate. (*Warne* v. *Harkness, supra*, 60 Cal.2d at p. 588.) No such contrary intent appears. Nothing in the brief language of article I, section 29 itself evinces such intent. Nor do the pertinent ballot arguments support such a meaning.[3]

The Court of Appeal's holding appears to have been based on the assumption that the people's right to due process of law must be the exact equivalent to a criminal defendant's right to due process, and that therefore the *Delaney* test should apply as much to the former as the latter, article I, section 28(d) notwithstanding. Nothing in the language or legislative history of article I, section 29 supports this view. Nor does anything in our case law. In some cases, the use of the term "due process of law" in connection with the prosecution was simply another way of formulating the truism that the state has a strong interest in prosecuting criminals, which must be weighed against the criminal defendant's assertion of due process rights. (See *Stein* v. *New York* (1953) 346 U.S. 156, 197 [73 S.Ct. 1077, 1099, 97 L.Ed. 1522], overruled on other grounds in *Jackson* v. *Denno* (1964) 378 U.S. 368, 391 [84 S.Ct. 1774, 1788-1789, 12 L.Ed.2d 908, 1 A.L.R.3d 1205]; *Snyder* v. *Massachusetts* (1934) 291 U.S. 97, 122 [54 S.Ct. 330, 338, 78 L.Ed. 674, 90 A.L.R. 575].) Elsewhere, particularly in California cases, the prosecution's right to due process has been invoked to affirm its right to be heard in various preliminary or collateral proceedings and to oppose a defendant's claim of right to be heard ex parte and in camera. (See *People* v. *Huston* (1989) 210 Cal.App.3d 192, 212 [258 Cal.Rptr. 393]; *Department of Corrections* v. *Superior Court* (1988) 199 Cal.App.3d 1087, 1092-1093 [245 Cal.Rptr. 293]; *People* v. *Dennis* (1986) 177 Cal.App.3d 863, 873 [223

---

[3]The only portion of the ballot argument in favor of Proposition 115 that commented even obliquely on article I, section 29, focused on the "speedy . . . trial" portion of that section. The ballot argument stated that Proposition 115's " 'NIGHTSTALKER' COMPONENT conforms California's criminal law to federal procedures, bringing California back into the mainstream of American criminal justice. This will mean major time savings for the typical California criminal proceeding. It took an incredible four years just to bring the 'Nightstalker' to justice! Imagine how much that cost you, the taxpayer, and how much anguish it caused his surviving victims through multiple, drawn-out court appearances." (Ballot Pamp., argument in favor of Prop. 115 as presented to the voters, Primary Elec. (June 5, 1990) p. 34.) Nowhere is there mention of the right to due process, nor any suggestion that it might alter existing evidentiary privileges and immunities. Indeed, those arguing in favor of Proposition 115 claimed that its opponents were "[t]he same people who opposed the 'Victims Bill of Rights [Proposition 8] . . . ,' " (Ballot Pamp., *supra*, at p. 34) thereby implying, if anything, that Proposition 115 was consistent with Proposition 8 and not intended to alter it.

Cal.Rptr. 236]; *People* v. *Sahagun* (1979) 89 Cal.App.3d 1, 25-26 [152 Cal.Rptr. 233].) The prosecution's right to due process, as far as we can determine, has not been recognized to encompass the breach of established evidentiary privileges and immunities, and there is no reason to suppose article I, section 29 intended that meaning.

The People, in contrast to the Court of Appeal and amicus curiae California District Attorneys Association, do not assert article I, section 29 as the primary justification for qualifying the newsperson's privilege. Rather, based on the history and ballot arguments of the shield law, they argue that the main purpose of the law is the protection of confidential sources, and when, as in this case, no confidential sources are involved, the shield law should yield in some cases to effective criminal prosecution.

■ As we made clear in *Delaney, supra*, 50 Cal.3d at page 798, the shield law applies to unpublished information whether confidential or not: The provision "states plainly that a newsperson shall not be adjudged in contempt for 'refusing to disclose *any* unpublished information.' " (Italics in original.) Thus, we rejected the argument that "article I, section 2(b) applies only to unpublished information obtained *in confidence* by a newsperson. Such a construction might be possible if the voters had used the phrase 'unpublished information' without the modifier 'any.' They did not do so. The use of the word 'any' makes clear that article I, section 2(b) applies to all information, regardless of whether it was obtained in confidence." (*Ibid.*) Moreover, the meaning of " 'unpublished information' " was defined in broad, nonrestrictive terms: " 'As used in this subdivision, "unpublished information" includes information not disseminated to the public by the person from whom disclosure is sought, whether or not related information has been disseminated and includes, but is not limited to, all notes, outtakes, photographs, tapes or other data of whatever sort not itself disseminated to the public through a medium of communication, whether or not published information based upon or related to such material has been disseminated.' Nowhere in this broad definition is there an explicit or implied restriction of article I, section 2(b) to confidential information." (*Id.*, at p. 799.)

■ Thus, it is beyond dispute that the information sought by the prosecution in the present case, unbroadcast portions of an interview of DeSoto by a newsperson, is "unpublished information" within the meaning of article I, section 2(b) and is thereby protected by that constitutional provision. Nor, as discussed above, is there any question that that protection, by the terms of article I, section 2(b), is absolute, and may be overcome only by a countervailing federal constitutional right, as in *Delaney*. (*New York Times Co.* v. *Superior Court, supra*, 51 Cal.3d at p. 461.) As explained above, article I, section 29 is not such a right.

Nor is the interpretation of the shield law to vigorously protect unpublished though nonconfidential information in any sense irrational. ■ "A comprehensive reporter's immunity provision, in addition to protecting confidential or sensitive sources, has the effect of safeguarding '[t]he autonomy of the press.' (*O'Neill* v. *Oakgrove Constr.* (1988) 71 N.Y.2d 521, 526 [528 N.Y.S.2d 1, 3 . . .] [construing a similar state constitutional provision].) . . . [¶] The threat to press autonomy is particularly clear in light of the press's unique role in society. As the institution that gathers and disseminates information, journalists often serve as the eyes and ears of the public. [Citations.] Because journalists not only gather a great deal of information, but publicly identify themselves as possessing it, they are especially prone to be called upon by litigants seeking to minimize the costs of obtaining needed information." (*Delaney, supra,* 50 Cal.3d 785, 820-821 (conc. opn. of Mosk, J.); see also *Matter of Woodhaven Lumber* (1991) 123 N.J. 481 [589 A.2d 135, 143]; *United States* v. *Cuthbertson* (3d Cir. 1980) 630 F.2d 139, 147.) ■ The threat to the autonomy of the press is posed as much by a criminal prosecutor as by other litigants.

Thus, there is nothing illogical in interpreting "the people['s] . . . right to due process" *not* to include the right to compel the press through the sanctions of contempt—incarceration and substantial fines—to supply unpublished information obtained in the newsgathering process. The fact that the assertion of this immunity might lead to the inability of the prosecution to gain access to all the evidence it desires does not mean that a prosecutor's right to due process is violated, any more than the assertion of established evidentiary privileges against the prosecution would be a violation. (See *Jones* v. *Superior Court* (1962) 58 Cal.2d 56, 60-61 [22 Cal.Rptr. 879, 372 P.2d 919, 96 A.L.R.2d 1213] [prosecutorial discovery limited by privilege against self-incrimination and attorney-client privilege]; *Izazaga* v. *Superior Court* (1991) 54 Cal.3d 356, 369 [285 Cal.Rptr. 231, 815 P.2d 304] [suggesting the same under Proposition 115's reciprocal discovery provisions].)

The People cite in support of their position the following passage in *Delaney*: "Although the reporters concede that a criminal defendant has a constitutional right to a fair trial, they contend, without citing any authority, that the prosecution does not have a similar right to obtain information subject to the shield law. Of course, the prosecutor vigorously disagrees. There is authority which *suggests* that a state may have a right sufficient to overcome a claim of immunity under the shield law. (*Mitchell* [v. *Superior Court* (1984)] 37 Cal.3d 268, 278 [208 Cal.Rptr. 152, 690 P.2d 625]; *Branzburg* [v. *Hayes* (1972)] 408 U.S. 665, 700 [33 L.Ed.2d 626, 650-651]; *United States* v. *Nixon* [(1974)] 418 U.S. 683, 709 [41 L.Ed.2d 1039, 1039, 1064-1065].) In light of our determination, however, that Delaney is entitled

to the reporters' testimony, the question as to the state's right to the same evidence is rendered moot. We therefore need not, and do not, decide whether the prosecution in a criminal proceeding can have a constitutional interest sufficient to require the disclosure of information otherwise protected by the shield law." (*Delaney, supra,* 50 Cal.3d at p. 816, fn. 34, italics in original.)

Although we thus posed the question at issue in this case in *Delaney,* we did not decide it. On closer examination, none of the authority cited by *Delaney* (*supra,* 50 Cal.3d at p. 816, fn. 34) as suggesting "a [constitutional] right sufficient to overcome a claim of immunity under the shield law" on the part of the prosecution in fact supports that position, for none of those cases addressed the shield law. In *Mitchell* v. *Superior Court* (1984) 37 Cal.3d 268 [208 Cal.Rptr. 152, 690 P.2d 625], we considered whether a newsperson who is a defendant in a libel suit can be compelled to reveal confidential information during the discovery process. As we made clear, the shield law was not at issue; rather, because newspersons and a news organization were parties in the case, they could be subject to sanctions other than contempt for failing to reveal the requested information, including entry of judgment against them. (*Id.,* at p. 274.) Therefore, our analysis was based on an implied First Amendment shield against such sanctions rather than the explicit immunity from contempt found in our state Constitution. (*Id.,* at pp. 274-276.) We concluded that a newsperson who was a party to litigation was eligible for a limited protection from civil discovery, subject to a balancing test similar to the one later articulated in *Delaney.* (*Id.,* at pp. 279-283.) As we made clear subsequently in *New York Times Co.* v. *Superior Court, supra,* 51 Cal.3d at page 461, a newsperson not a party to civil litigation is subject to "virtually absolute immunity" for refusing to testify or otherwise surrender unpublished information.

In *Branzburg* v. *Hayes* (1972) 408 U.S. 665 [92 S.Ct. 2646, 33 L.Ed.2d 626], the United States Supreme Court held that the First Amendment did not provide a newsperson with a privilege from testifying in front of a grand jury in a criminal case. The *Branzburg* court acknowledged, however, that "state legislatures [are] free, within First Amendment limits, to fashion their own standards in light of the conditions and problems with respect to the relations between law enforcement officials and [the] press in their own areas." (*Id.,* at p. 706 [92 S.Ct. at p. 2669].) As we recognized in *Delaney, supra,* 50 Cal.3d at page 796, the current version of the shield law was adopted "apparently in response to *Branzburg,*" and, following *Branzburg*'s dictum, expanded the scope of the newsperson's protection from disclosure beyond what the First Amendment provides. The holding in *Branzburg* is therefore inapposite to the present case.

In *United States* v. *Nixon* (1974) 418 U.S. 683 [94 S.Ct. 3090, 41 L.Ed.2d 1039], a special prosecutor sought from the President of the United

States audiotapes of certain confidential communications. The President asserted an executive privilege based in part on the need to protect communication between high-level government officials and in part on the separation of powers doctrine, which gives the executive branch some degree of autonomy from the judicial branch. The United States Supreme Court, while acknowledging an executive privilege, held that it was not absolute, given the importance of furthering the workings of the criminal justice system. As the court stated: "The very integrity of the judicial system and public confidence in the system depend on full disclosure of all the facts, within the framework of the rules of evidence. To ensure that justice is done, it is imperative to the function of courts that compulsory process be available for the production of evidence needed either by the prosecution or by the defense." (*Id.*, at p. 709 [94 S.Ct. at p. 3108].) The court recognized that "[t]he right to the production of all evidence at a criminal trial . . . has constitutional dimensions. The Sixth Amendment explicitly confers upon every defendant in a criminal trial the right 'to be confronted with the witnesses against him' and 'to have compulsory process for obtaining witnesses in his favor.' Moreover, the Fifth Amendment also guarantees that no person shall be deprived of liberty without due process of law. It is the manifest duty of the courts to vindicate those guarantees, and to accomplish that it is essential that all relevant and admissible evidence be produced." (*Id.*, at p. 711 [94 S.Ct at p. 3109].) The court elsewhere referred to the conflict between the asserted executive privilege "and the constitutional need for relevant evidence in criminal trials." (*Id.*, at p. 712, fn. 19 [94 S.Ct. at p. 3109].)

The *Nixon* court acknowledged that the need for "full disclosure of all the facts" existed side-by-side with well-established evidentiary privileges "designed to protect weighty and legitimate competing interests. Thus, the Fifth Amendment to the Constitution provides that no man 'shall be compelled in any criminal case to be a witness against himself.' And, generally, an attorney or a priest may not be required to disclose what has been revealed in professional confidence. These and other interests are recognized in law by privileges against forced disclosure, established in the Constitution, by statute, or at common law." (418 U.S. at pp. 709-710 [94 S.Ct. at p. 3108.) But as the court further stated: "Whatever their origins, these exceptions to the demand for every man's evidence are not lightly created nor expansively construed, for they are in derogation of the search for truth." (*Id.*, at p. 710 [94 S.Ct. at p. 3108.) The court thus concluded that the executive privilege was a qualified one that had to be weighed against the "the fair administration of criminal justice." (*Id.*, at pp. 711-712 [94 S.Ct. at p. 3109].) When the privilege is "based only on the generalized interest in confidentiality," rather than specific national security concerns, "it cannot prevail over the fundamental demands of due process of law and the fair administration of criminal justice." (*Id.*, at p. 713 [94 S.Ct. at p. 3110].)

*Nixon* does not support the People's position. Its significance was recently clarified in *Swidler & Berlin* v. *United States* (1998) 524 U.S. 399 [118 S.Ct. 2081, 141 L.Ed.2d 379]. In that case, the court rejected the argument that the attorney-client privilege had to be narrowly construed as not surviving a client's death—contrary to precedent—in order to promote "the paramount judicial goal of truth seeking." (524 U.S. at p. 410 [118 S.Ct. at p. 2087].) The court found the prosecution's reliance on *Nixon* and *Branzburg* in support of its position misplaced. These cases "dealt with the creation of privileges not recognized by the common law, whereas [the attorney-client privilege is] one of the oldest recognized privileges in the law." (*Ibid.* [118 S.Ct. at pp. 2087-2088].) And unlike in *Nixon* and *Branzburg*, the court was being asked not simply to construe the privilege "but to narrow it, contrary to the weight of the existing body of case law," and declined to do so. (*Ibid.* [118 S.Ct. at p. 2088].) Thus, *Swidler & Berlin* clarifies that the "federal constitutional need for relevant evidence in criminal trials" recognized in *Nixon* does not alter the scope of privileges and immunities well established in the law.

 In this case, we are not concerned with the judicial creation of a new privilege. Rather, the Attorney General asks us to narrow the shield law, an evidentiary immunity found in the state Constitution, in a manner contrary to its express terms, because federal due process compels such a result. *Swidler & Berlin* makes clear that there is no such constitutional compulsion. Nor may we convert an absolute into a qualified immunity merely because it is in accord with a particular conception of the proper balance between journalists' rights and prosecutor's prerogatives. Thus, the absoluteness of the immunity embodied in the shield law only yields to a conflicting federal or, perhaps, state constitutional right. As explained, there is no such conflicting right presented in this case.

III. DISPOSITION

For all the foregoing reasons, the judgment of the Court of Appeal is reversed and the cause remanded to that court with directions to cause issuance of a peremptory writ of prohibition as prayed.

George, C. J., Kennard, J., Baxter, J., and Chin, J., concurred.

**BROWN, J.**—Although I concur with the result and the bulk of the majority's reasoning, I do not agree with the majority's analysis of the alleged conflict between California Constitution, article I, sections 28, subdivision

(d)[1] and 29. (See maj. opn., *ante*, at pp. 895-896.) The principle that a specific provision governs over a general provision only applies if there is an *actual* conflict between the two provisions. No actual conflict exists here. The media exception in section 28, subdivision (d), by its terms, is confined to "this section" and does not expressly preclude a more general provision from narrowing the scope of a newsperson's immunity. This qualified language should not insulate the media exception from future modifications or alterations, especially given that the electorate could have expressly done so. (See, e.g., §§ 27, 30, subd. (a).) Indeed, nothing in the pertinent ballot measures even suggests such an intent. Because this aspect of the majority's analysis is both suspect and unnecessary to its holding and may affect other constitutional provisions with clauses analogous to section 28, subdivision (d) (see, e.g., §§ 7, subd. (a), 24, 31, subds. (c)-(e); art. IV, § 5, subd. (d), art. V, § 14, subd. (d), art. X B, § 15, art. XIII D, § 1, art. XVI, §§ 5, 6, 16, subd. (c)), I decline to adopt it.

Werdegar, J., concurred.

---

[1]All references are to article I of the California Constitution unless otherwise indicated.